James E. COURTIN, Appellant,

v.

Llewellyn SHARP, IV, Appellee.

No. 18223.

United States Court of Appeals
Fifth Circuit.

July 27, 1960.

James E. Courtin, New Orleans, La., for appellant.

David C. Treen, New Orleans, La., for appellee.

Before RIVES, Chief Judge, and CAMERON and BROWN, Circuit Judges.

RIVES, Chief Judge.

This action was for $6,000, the purchase price of a yearling colt ("by Devil Diver out of Bill's Marge") allegedly sold by Sharp to Courtin. Before actual delivery and while the colt was still in Sharp's paddock it was accidentally killed.[1] No issue of negligence in the care of the colt was made, but Courtin's sole defense was that, at the time of the colt's death, title to the colt had not passed to him with the consequent risk of loss.

Sharp was a breeder of race horses on a farm near Lexington, Kentucky. Courtin was a lawyer resident in New Orleans who owned several horses and was interested in acquiring a colt sired by a stallion named "Devil Diver." Courtin asked two friends of his who were to attend the Kentucky Derby of May 5, 1956, to be on the lookout for such a colt. According to Sharp, one of Courtin's friends actually agreed on the purchase of the colt for Courtin at a price of $6,-

1. Mr. Sharp testified:
"This Devil Diver yearling was turned out in the paddock. It was in the morning and for some reason he stuck his head between two boards in a board fence that enclosed his paddock, and a fly bit him or something, and scared him, and he jerked back and it broke his neck right behind the head, and he fell right down. I was sitting on my front porch at the time it happened and saw it as it happened. And I ran in and called for the veterinary and he came right out; but he pronounced the colt dead when he got there."

000 to be paid in cash. Courtin's friends denied any actual purchase at the time of their visit to Sharp's farm. Courtin and his friends all testified that Courtin had not authorized any purchase of the colt, but admitted that its purchase was recommended to Courtin. One or two days following the visit of Courtin's friends to the Sharp farm, Sharp made a long distance telephone call to Courtin. Their testimony as to this conversation is diametrically opposed. Sharp's version of that conversation was as follows:

"Q. Well, did you discuss price or delivery or any other terms at that time? A. Mr. Courtin was already informed of the price of $6,-000.00 and he asked me would I keep the colt at the farm and board him for him for two or three months until he came up to pick up some more horses that he said he was going to buy. I told him that since he was sending me my check right off, that I wouldn't charge him for boarding his horse for a couple of months, that I would keep him up there without charging him anything; and he asked me to be sure that I took care of his horse in the same manner that he had been receiving, and I told him that I would.

"Q. Can you give us the approximate date of this telephone conversation? A. Approximately the 4th or 5th of May.

"Q. Did not Mr. Courtin indicate to you during his telephone conversation that he hadn't made up his mind about the colt, he wanted to think about it? A. No, sir, he very definitely said he bought the colt, and that my check would be in the mail that day."

On the other hand, Courtin testified:

" * * * . Mr. Sharp phoned me and asked me about the horse, whether I was buying him or whether I was not buying him; and I told him I didn't know whether I would or I wouldn't until such time as I saw some pictures that had been taken of the horse by Mr. Gruber and his wife. Sometime after that, I'm a little ahead of my story. In that same conversation, Mr. Sharp told me that he would not take less than $6,000.00 for the horse. I told him that I would let him know something after I saw the pictures. * * * "

Four or five days later, Sharp again called Courtin by long distance telephone. That second telephone conversation, according to Sharp, was in substance as follows:

"Well, several days had gone by and I hadn't received any check and I called him to see what was the delay in sending the check. He said that for me not to worry, that he had bought the horse, that he was just a little close on financial things at the time, but that he would send the check; and he asked me would I let him pay for it part of it then and part of it later. And we came to an agreement that I would accept $2500.00 at the time and within ninety days or sooner, he would pay the balance of $3500.00. So at that time I told Mr. Courtin if I was going to accept partial payment and then the balance later, that I would require a board bill for the time that I kept his colt at the farm, and I told him that I would take Eighty Dollars a month to board his horse; and he agreed with that."

Again, Courtin's version was different:

" * * * I think about the 10th or 11th of May, Mr. Sharp phoned me again. I had seen the still pictures at that time and I was interested in the colt, and I told Mr. Sharp at that time that I thought I would probably buy him, provided several things. One was that he would be paid part cash and the remainder at the end of ninety days, and that I would want the colt boarded at his place, since the colt had been raised there, until I had him picked up for training purposes; and he told me he would charge me $80.-

00 a month for that service. I told him then to draw up contracts, or have his attorney do it, and mail them to me and if the contracts were satisfactory, I felt sure I would buy the colt. * * * "

Following this second telephone conversation, Sharp had his attorney draft a contract between Sharp as "party of the first part" and Courtin as "party of the second part," which provided as follows:

"That for and in consideration of the sum of One ($1.00) Dollar cash in hand paid and other good and valuable consideration, the receipt of which is hereby acknowledged, the party of the first part sells to the party of the second part as of May 5, 1956, one yearling by Devil Diver out of Bill's Marge, which yearling is dark brown in color with a white stripe on its face, upon the following terms and conditions:

"(1) The purchase price is in the amount of Six Thousand ($6,000.00) Dollars of which the sum of Twenty-Five Hundred ($2500.00) Dollars is paid to first party by the second party at the time of the signing of this agreement, the receipt of which is hereby acknowledged.

"(2) The balance of Thirty-Five Hundred ($3500.00) Dollars is to be paid within ninety (90) days of the date of this contract.

"(3) The first party retains possession of said yearling and the first (sic) party is to pay to first party the sum of Eighty ($80.00) Dollars per month as board. Prior to the time said yearling is removed from the custody and possession of first party second party agrees to pay the additional sum herein referred to in paragraph No. 2."

Sharp's attorney mailed two unsigned copies of that contract to Courtin, accompanied by a letter stating:

"At the request of Mr. Llewellyn Sharp, IV, I have prepared a contract with reference to the yearling you purchased from him. Would you be kind enough to execute this contract and return it to me with your check for $2500.00 and I will return your copy."

Sharp and his attorney and the attorney's secretary testified that Sharp signed a third copy of the contract and left it with the attorney. That fact, however, is not shown to have been communicated to Courtin prior to the colt's death.

On Friday, May 18, 1956, Courtin signed the two copies of the contract which he had received, had his signature witnessed by his secretary, and deposited them in the mail addressed to Sharp's attorney, together with his check payable to Sharp in the sum of $2,500. The copies of the contract signed by Courtin and Courtin's check were not received by Sharp's attorney until Monday morning, May 21, the day following the death of the colt.

Sharp's attorney further testified:

" * * * Following the receipt of the check and writing, Mr. Sharp came to the office and at his request I placed a phone call to Mr. Courtin, care of his office, Northern Bank and Commerce Building, New Orleans, Louisiana. I introduced myself to Mr. Courtin, after a person representing himself to me to be Mr. James Courtin, responded to my call, and advised him that Mr. Sharp wished to talk to him. Mr. Sharp went to the library and talked from an extension phone and I overheard the entire conversation. The conversation, as I recall it, was as follows: Mr. Sharp advised Mr. Courtin that the 'Devil Diver' yearling which he had purchased from Mr. Sharp had broken his neck the day before. Mr. Courtin advised Mr. Sharp in substance that things like that happen every day, but not to worry about it since he, Courtin, had bought the horse and would pay for it, and further that he had it insured anyway. He further advised Mr. Sharp that he would send him the balance of the purchase money very shortly.

This concluded the conversation between Mr. Sharp and Mr. Courtin."
Sharp himself testified as to that phone conversation as follows:

"I called or I talked with Mr. Courtin, Mr. Shouse placed the call, but I talked with him from the phone in Mr. Shouse's library, which is an extension phone, and informed him of the colt's death, and he said, 'Don't worry about it. It happens all the time. I have the colt insured. I'll send your money. Send me a death certificate.' I was upset about the thing, I was trying to cultivate Mr. Courtin as a future customer and I was very much more downcast about it than he was, and he told me several times, 'Just don't worry about it, just send me the death certificate and forget about it. I have the horse insured, and its alright.' That was about all of our conversation."

Courtin's version of this last telephone conversation is materially different:

" * * * On Monday morning, I was notified that the colt had been killed that Sunday morning, May 20, and that conversation was a conversation between Mr. Sharp and myself. Whether it came from Mr. Shouse's office, or where it came from, I do not know; but I did not tell Mr. Sharp or anyone else that I had the horse insured, because I didn't. I couldn't insure a horse because there is one rule that the insurance companies have relative to the insuring of horses—and that is, they will not insure a horse without the foal paper registered in your name, and I did not have foal papers and could not possibly have insured the horse; and I think Mr. Sharp knows that. I told him nothing about insurance and nothing about sending any further money to him. I expressed my sympathy about the fact that so beautiful a little colt had been killed, and that was the sum and substance of that conversation. * * * "

Courtin then stopped payment on the $2,500.00 check. Nearly a month later, under date of June 19, 1956, Sharp wrote to Courtin as follows:

"After I advised you by telephone on about the 21st day of May, 1956, that the colt I sold you had been killed, I have not heard from you. Mr. Shouse delivered to me your check for $2,500.00, which I deposited on about the 6th day of June 1956. This check was returned to me on the 14th day of June.

"I feel that at the time this colt died he belonged to you. I could have cashed your check and not told you about the colt's death, but I felt that you should know, so I called you. I would like some answer from you as to what your feeling is about this loss."

Courtin did not respond to that letter. A year and a half later, on January 17, 1958, this action was filed.

The district court entered a full written opinion in which it treated the case as turning on one disputed issue of fact [176 F.Supp. 1]: "that is, did the defendant, as purchaser, attach to his acceptance the condition that he should first see moving pictures of the colt before the deal was closed?"

The district court's opinion concluded as follows [176 F.Supp. 1, 3]:

" * * * The sole proof on the point is the testimony of defendant on the trial, which is vigorously contradicted by plaintiff. The latter is supported by the written document or *contract* signed by defendant and returned to plaintiff May 18th, two days before the colt was killed, and, in doing so nothing was said about the alleged condition but, as stated earlier, express provision was made for plaintiff to 'board' the colt for defendant at the price of $80.00 per month. In such circumstance, it is believed that, at best, defendant's sole testimony is offset by that of plaintiff, while the written contract, one copy of which

plaintiff swore he had signed when the two were sent to and signed by defendant (one for each of the parties) in the presence of a witness, and the original mailed to plaintiff on the date stated.

"The sale was, therefore, complete by the meeting of the minds of the seller and purchaser on all essential and expressed terms of the agreement. Sec. 361.190 Kentucky Revised Statutes, LSA–Civil Code, Article 2467.

"Plaintiff should have judgment as prayed for."

 It is not necessary for us to decide whether the written contract had been sufficiently executed and delivered prior to the death of the colt, for under the testimony credited by the district court there was a completed verbal sale of the colt by telephone conversation between Sharp and Courtin.

Whether that verbal agreement be considered a Louisiana contract or a Kentucky contract, it is conceded that the risk of loss follows the title. See Section 361.190 Kentucky Revised Statutes; LSA–Civil Code, Articles 2467, 2456.

Courtin urges, however, that "no title was transferred because an agreement was to be reduced to writing, signed by the parties, and this was not done." Citing, Breaux Brothers Construction Co. v. Associated Contractors, 1954, 226 La. 720, 77 So.2d 17.

Sharp agrees that whether the verbal agreement takes effect as a complete contract at once, or only when a formal written contract is executed, depends on the intention of the parties. Citing and quoting from 17 C.J.S. Contracts § 49, p. 391; Mermelstein v. Schwab, La.App. 1953, 64 So.2d 37, and a commentary in 15 Louisiana Law Review P. 824.

Clearly, under all of the authorities, the matter is one of intention. There was ample evidence to sustain the findings, at least impliedly made by the district court, that the sale of the colt was completed as of a date earlier than

its death, and that there was no intention to suspend or condition the sales agreement upon the subsequent execution of the written contract.

The judgment was right and it is Affirmed.

CAMERON, Circuit Judge, concurs in the result.