WARRIOR CONSTRUCTORS, INC., Appellant,

v.

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL UNION NO. 926, AFL–CIO, Appellee.

No. 23956.

United States Court of Appeals Fifth Circuit.

Sept. 19, 1967.

L. G. Clinton, Jr., Houston, Tex., Homer L. Deakins, Jr., Greenville, S. C., for appellant.

Joseph Jacobs, Harris Jacobs, Atlanta, Ga., for appellee, International Union of Operating Engineers, Local Union No. 926, AFL-CIO.

Before RIVES and DYER, Circuit Judges, and JOHNSON, District Judge.

RIVES, Circuit Judge:

The appellant, Warrior, seeks specific enforcement of an arbitration clause contained in an alleged collective bargaining contract between it and the appellee Union. At the beginning of the trial, the Union conceded that if the Court found that there was a contract it would have to follow its terms and provisions, including the grievance and arbitration clause, and further that the disagreement between Warrior and the Union would be subject to arbitration.[1] The alleged contract had been reduced to writing but had not been signed by either of the parties. The sole issue is whether the contract had become legally binding upon the Union. The district court in a full and able unreported opinion (R. pp. 239–254) held that there was no binding contract. We agree.[2]

The following findings of fact by the district court are virtually undisputed:

"Findings of Fact.

"Warrior is a union organized Texas construction firm which successfully bid on a number of projects in Georgia, among them the construction of the At-

---

1. Failure of the parties to arbitrate had led to a strike at the site of construction of the new Atlanta Auditorium on which Warrior's fixed daily overhead was in excess of $1,500.00.

2. The district court's jurisdiction under Section 301 of the Labor Management Relations Act, 29 U.S.C.A. § 185(a), is not affected by the fact that Warrior might also have proceeded before the National Labor Relations Board by charging that the Union violated Section 8(a) (5) of the Act in refusing to sign the contract. See H. J. Heinz Co. v. NLRB, 1941, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309; NLRB v. Dalton Tel. Co., 5 Cir. 1951, 187 F.2d 811.

lanta Auditorium. Since it is union organized Warrior notified the local union that it would meet the existing union area standards as to wages and working conditions.

"The Atlanta Building Trades Council is a loose, apparently informal organization of a number of local unions involved in the construction industry. According to its business representative, George Caudelle, main functions of the Council are to provide an instrument for the trading and gathering of information important to member unions and a platform for collective action in areas of common interest, such as the negotiation of contracts with management. The Council apparently operates through its business representative, Caudelle. He in turn is loosely directed by a weekly morning meeting of the business agents and presidents of the member unions (including Ben Suddeth, President and Assistant Business Agent of defendant Local), with whom he discusses council business. Some matters are taken back to the unions for approval or disapproval, while other matters receive informal approval or disapproval at the meetings. No minutes are kept of these meetings, and no records are kept of which member unions are represented at the meetings. The whole system operates through each union representative's intimate knowledge of desires of his own union members and what measures by the Council they will or will not support.

"In the present case the twelve member unions which were to represent Warrior's employees decided to hire an attorney to work out a collective bargaining contract which would effectively deal with two points of common concern to them: the elimination of a 'dummy corporation' set up by a general contractor to avoid a Union contract on other jobs; and gaining the assurance of the general contractor that all sub-contractors would abide by the area standards. As a result, Caudelle retained Carter, who attended one of the Council meetings and was informed of the Council's desire for a contract including a dummy corporation

and a subcontractor clause. The twelve Unions stated that they wanted twelve separate contracts, one to be executed by each of the twelve Unions involved. Carter drew up a proposed contract including these two clauses, along with others. Carter did not get approval from the Council or from any of the individual unions as to the other portions of this proposed contract.

"Warrior was sent the proposed contract with a cover letter.[1] An attach-

"1. The cover letter reads as follows:
'Date April 15, 1965
'Mr. R. E. Griffin—Proj. Manager
Warrior Const. Co.
Box 6342
Atlanta, Georgia
'Re: Proposed sub-contracting and "dummy corporation" provisions.
'Mr. Griffin, Sir:
'This is to apprise you that the Atlanta Building and Construction Trades Council has been appointed and authorized by a number of local unions, individually, to conduct negotiations, in behalf of each of these authorizing unions, severally and individually; toward the end of obtaining respective sub-contracting and "dummy corporation" provisions to govern future job letting, to the extent permitted by law. A blank, standard copy of each of their said, several, appointments is attached hereto as Attachment #1, and each of these said authorizing unions is listed on the addendum to attachment #1.
'As to each of these aforesaid authorizing unions, respectively, we request that these negotiations commence immediately pursuant to their said independent authorizations. While these proposed negotiations for each of these unions are several and independent from the proposed negotiations as to each of the other said authorizing unions, it is our thought that all of these negotiations can perhaps be carried on concurrently with the greatest convenience to both parties.
'These proposed contractual provisions, upon their execution, will apply only to the letting of future jobs, to the extent permitted by law, and are not intended to apply to any existing contract relationship.
'It is our desire to receive this said information and to begin these proposed negotiations, in behalf of each of these said unions, severally, within the period of three work-days after your receipt of this letter. Thus, we shall await your

prompt reply to the undersigned, designating a convenient time and place for these negotiations to commence.

'Respectfully,

(S.) George B. Caudelle
Title: Business Manager
Atlanta Building and Construction Trades Council
Phone: 874–7041'

ment to that letter was a statement executed by each of the twelve interested member unions limiting the authority of Carter and Caudelle to negotiation on the two points only—dummy corporations and sub-contractor clauses.[2]

"2. The letter of authorization reads as follows:

'Date ................

'Dear Mr. ........

'I, the undersigned, hereby appoint and authorize the Atlanta Building Trades Council, through its representatives, to, in a lawful manner, initiate and conduct in behalf of my union, individually and independently, all necessary, appropriate, and lawful collective bargaining negotiations, for the purpose of obtaining lawful sub-contracting and "dummy corporation" contract provisions; said provisions to insure that all employees, performing the usual work of our craft and in our area shall, on future jobs, receive the wages and economic benefits ordinarily required by our union.

'This authorization to the Atlanta Building Trades Council is limited to the aforesaid objectives, and, the undersigned reserves the right, individually, in his sole discretion, to terminate this authorization during the course of these proposed bargaining negotiations and prior to execution of the proposed contract.

'Further, this authorization authorizes these said negotiations only in behalf of the undersigned's union, individually and independently; and the proposed sub-contracting negotiations in behalf of the undersigned's union, shall remain subject solely to the undersigned's individual approval, and to no other.

'Respectfully,

.............

Title: ...............
Name of Union: .........'

"Three meetings relevant to this issue took place in Atlanta between Warrior and various Union and Council officials, including Carter. The first meeting took place on May 25, 1965. Carter and Caudelle attended for the twelve Unions. The Unions' expectation of twelve separate contracts was made known to Warrior. Warrior stated it wanted to bargain as to a complete contract and asked Caudelle and Carter to bring written authorization to negotiate a complete contract. Carter, apparently without any grounds for doing so, assured Warrior that he would have no trouble getting authority to negotiate a full contract at the next meeting.

"The second meeting took place on June 7, 1965. Instead of written authorization, Carter brought the business agents of the twelve interested unions, including Ben F. Suddeth, assistant business agent of the defendant Union. The defendant's regular business agent, Archer, was in the hospital. Carter told Warrior that he had brought all his clients to prove his authority, and stated that he was spokesman for all twelve. The representatives present made no objections to Carter's statements and when Warrior asked for suggestions from others, Carter reiterated that he was the spokesman and all questions should be directed to him.

"In spite of this there appeared to be no further granting of authority to Carter in the form of a vote of the Union or the Atlanta Building Trades Council. As clearly reflected by the testimony of Union men Caudelle and Suddeth, attorney Carter apparently decided to take it upon himself to assume as much authority and importance in the negotiations as possible, without regard to the wishes of the Union representatives. After Carter took over, the Union laymen had little, if any, chance to control the direction of the negotiations.

"At this second session, Warrior presented various written proposals to be added to the original contract, directed primarily toward a 'no strike' provision and the use of arbitration for company grievances as well as minor complaints.

Considerable progress was made between Carter and Clinton regarding language.[3]

"3. For example, the language proposed by Warrior at the beginning of the second session (typewritten part of Plaintiff's Exhibit No. 2) was discussed, and Carter agreed on certain wording (written by Clinton in pencil on Plaintiff's Exhibit No. 2); but no agreement was reached as to its inclusion. Carter agreed to withdraw Article V of his first proposed contract (Plaintiff's Exhibit No. 1). Warrior agreed to abide by the two local Union area standards contracts as to wages and working conditions, one contract to apply to some work, the other contract to apply to other work, depending upon the type of work done.

"At the end of the second meeting, there were three areas of disagreement—recognition, grievance and arbitration (including a no-strike clause) and duration.

"The third meeting took place on June 14, 1965. It began at 1:30 p. m. and ended near midnight. Although representatives of all twelve unions, including Suddeth, were again present, they left as the meeting lengthened, and none were present at the end.

"Warrior again proposed a contract (Plaintiff's Exhibit No. 3) including language agreed on and Warrior's proposed language as to parts not agreed upon. The Union also proposed some new matters. Late that evening, after hours of bargaining, Carter and Warrior finally reached an agreement as to the language found in Plaintiff's Exhibit No. 4 (See Clinton's notes, Plaintiff's Exhibits Nos. 6 and 7).

"The last and most difficult question was duration. Warrior insisted on a four or five year contract, while the union held out for one year. Agreement was reached on three years about 11:00 P.M., at which time all union representatives had gone. Suddeth left the meeting between 9:00 or 9:30 P.M. and was not present during the discussions or agreement on the matter of duration.

"Carter apparently assured Warrior that a contract had been reached and would be typed up by him and signed by the Unions before being sent to Warrior for final signature. No such contract was forthcoming and on June 23, 1965, Warrior sent a copy of the contract language (Plaintiff's Exhibit No. 4) and a cover letter (Plaintiff's Exhibit No. 5) to Carter, who proposed additional language in letters his (sic) of June 28, 1965 (Defendant's Exhibit No. 1), July 1, 1965 (Defendant's Exhibit No. 2) and July 12, 1965 (Defendant's Exhibit No. 3). Warrior did not reply to these new proposals for the stated reason that it believed a contract had already been reached.

"That the Union, as opposed to Carter, did not agree to this proposed contract is evident. Suddeth stated after the third meeting that the defendant Union could not accept a no-strike provision.

"After a discussion of the proposed contract with business agent Archer, it was definitely decided that they could not recommend it to the Union because of the no-strike and arbitration provisions to which they were opposed. Although Carter personally favored the no-strike clause, Caudelle testified that the membership was against it. Since the Union representatives felt that the contract was unacceptable, and would not recommend the contract, no formal vote was taken in the defendant Union.

"The Constitution and by-laws of the International Union of Operating Engineers, AFL-CIO (Defendant's Exhibit No. 5), of which defendant Union is local No. 926, provide at page 108, Article 23, that the ratification of a proposed collective bargaining contract by a vote of the membership is required before a contract is effective. Although Clinton stated he was not familiar with this provision, he was aware of the existence of such by-laws and had been for some 15 years, Warrior, as a union contractor, had negotiated through Clinton and signed many contracts with various locals of this Union over such period.

"In spite of Clinton's testimony that he had been in collective bargaining contract negotiations wherein a Union

Attorney-negotiator signed the contract without ratification by Union membership, the prevailing practice in this and other Unions is for the membership to ratify a contract before it is effective." [3]

Certain other findings of the district court seem to be mixed findings of fact and conclusions of law, for example:

"The facts show clearly that Carter and Caudelle had no actual authority to bind the Union to a contract. No vote was ever taken to authorize either to sign for the Union, nor did the Union President or Business Agent authorize such. In fact, the Union Constitution forbids this and specifically limits the Union representatives' authority as to the signing of collective bargaining contracts. The extent of their authority was clearly limited by the letter of April 15, 1965.

"However, Warrior argues that Carter, as spokesman, was clothed with the apparent authority to bind the Union to a contract, and the presence of union representatives at the meetings gave Carter an implied authority to bind the Union.

"There were no prior contracts between the parties and no prior dealings between the negotiators on which to base implied authority.

"From the very beginning Warrior was put on notice of Carter and Caudelle's strictly limited authority by the unequivocal language in the letter of April 15, 1965, and the attached 'authorization,' executed by the twelve unions. From the outset, it was stated that the intention was to sign twelve separate contracts with Warrior, not one contract.

"When Clinton asked Carter to get written authority to negotiate for a complete contract, none was forthcoming. Instead Carter brought twelve union representatives who assented to his statement that he was 'spokesman' for the group. This assent to Carter's authority to negotiate as to additional matter in a contract cannot be said to be authority to bind the Union to a contract. The inference that Carter could bind the Union, if made by Warrior, cannot overcome the written limitation of authority of which Warrior had actual notice.

"As to implied acceptance, the actions of the Union representatives in remaining silent while Carter negotiated may be sufficient to impliedly authorize Carter to negotiate with Warrior, but this is not sufficient to constitute an implied authority to bind the twelve unions to the twelve separate contracts. At the most, Carter had the actual or implied authority only to negotiate on contract proposals which would then be taken back to the Union representatives, and if approved by them, to the Union membership for a formal vote.

"Even assuming arguendo that silence by Union representatives while present authorized Carter to bind the Union contrary to its Constitution and By-laws, the evidence revealed that defendant Union's representative Suddeth was not present at the end of the third meeting when such essential matters to the entire contract as duration were discussed.

"None of the twelve Unions involved have signed a contract with Warrior as the result of these negotiations. Warrior has met local Union standards as to wages and working conditions, but was doing so before as a union contractor. A short strike occurred in July, 1965, right after the alleged contract was agreed upon, and a meeting between Clinton and Carter resulted, but Warrior did not at that time attempt to proceed under the contract as it has done here. It is plain that neither party has assumed or acted as if a contract existed for the last seven and one-half months since the Unions stated (Defendant's Exhibits Nos. 1, 2 and 3) they did not think a contract agreement had been reached.

3. Warrior insists that the finding by the district court that "the prevailing practice in this and other Unions is for the membership to ratify a contract before it is effective" is not supported by any evidence in the record. We agree with Warrior that the record does not disclose that such is the *prevailing* practice, though it does make clear the existence of such a practice in some unions.

In spite of Warrior's good faith in the negotiations and in spite of the posture struck by Carter during the meetings, it is concluded for the reasons stated herein, that neither he nor Caudelle had the power to bind the defendant union, much less to execute a contract on its behalf, on well-recognized principles of agency. See in this connection generally 2 CJS, Agency § 99 at 1227 (implied authority); 2 CJS, Agency § 92 at 1188 ff and particularly § 96 at 1205 (apparent authority)."

 Our study of the record in the light of the briefs and argument leads us to agree with the result reached by the district court. Good faith bargaining is intended to assist and encourage, but not to compel, the parties to reach an agreement. The statute wisely permits the broadest latitude of action. In some cases it may facilitate the reaching of an agreement to have at the conference table representatives with authority to bind their principals; in other instances, it may be best that the authority of the representatives extend no further than to confer and negotiate and make recommendations to their respective principals. Long before the Labor Management Relations Act of 1947, the signing of a written agreement had been recognized as the final step in the bargaining process. H. J. Heinz Co. v. NLRB, 1941, 311 U.S. 514 [61 S.Ct. 320]. Nonetheless, it is not mandatory that the contract be written. Rabouin v. NLRB, 2 Cir. 1952, 195 F.2d 906, 910. These principles are succinctly stated in 29 U.S.C.A. 158(d) as follows:

"(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession * * *."

Clinton did not object to that part of the limitation imposed by the letter of authorization which stated that

" * * * the undersigned reserves the right, individually, in his sole discretion, to terminate this authorization during the course of these proposed bargaining negotiations and prior to execution of the proposed contract.

"Further, this authorization authorizes these said negotiations only in behalf of the undersigned's union, individually and independently; and the proposed subcontracting negotiations in behalf of the undersigned's union, shall remain subject solely to the undersigned's individual approval and to no other."

What Clinton did object to was limiting the discussion to the subcontracting and "dummy corporation" contract provisions. We think that much appears from Clinton's own testimony:

"Q. Mr. Clinton, what actually was said with respect to the authority of these two representatives?

"A. Well, when I raised the question of the authority and capacity to enter into a negotiation of a complete agreement on behalf of these twelve Local Unions, it was at that point that Mr. Carter and Mr. Caudelle said, at that time, that their authority during that meeting was limited to a discussion of the so-called sub-contractor clause, and of the so-called 'dummy corporation' clause; that those were the only two issues that they were authorized to discuss. Those, basically, were the main topics of our discussion, although we did discuss generally the entire agreement. I told them that if (sic) were to continue negotiations, that I wanted them to be fully authorized to negotiate a complete agreement, as we were, as I was on behalf of the Warrior, and as the Vice President, Mr. Chapman, was on behalf of Warrior. At that point, they assured us that they would have no difficulty getting the

authority to negotiate a complete agreement on all matters from the various Local Unions.

"During the course of our first meeting we specifically mentioned matters concerning jurisdictional disputes, matters concerning a no-strike provision, matters concerning a complete arbitration clause, because the clause proposed in their agreement is only a one sided arbitration, only one part of the disputes are (sic) subject to arbitration, and there perhaps were other matters that we discussed, but they assured us that they would get the necessary authority from the various Local Unions and would come to the next meeting with this authority.

"I told Mr. Carter that I was familiar with the fact that different Unions authorized people in different ways to represent the Unions, and that perhaps if he got an affidavit from the President of some of the Local Unions, that that would be sufficient, but perhaps in other cases it might take action of the Union's executive Board to authorize him to negotiate on behalf of the Union, but that I would leave it entirely up to him to determine whoever the proper official or group was, but rather to come to the next meeting with full power to authorize, and authority on behalf of the Local Unions to negotiate a complete agreement. He assured us that he would do so, and that he and Caudelle would have absolutely no difficulty in getting this authority."

Apparently, if Carter had secured written authority to discuss and negotiate a complete agreement, Clinton would have been satisfied even though any agreement reached would then be subject to the approval of each of the business agents as to the twelve separate contracts.[4] Instead, however, the business agents themselves appeared with Carter at the second meeting. And since they were the same persons who retained the right to approve the negotiations, it is argued that thereafter the negotiators had authority to bind each of the twelve unions. This argument is more plausible than sound. The business agents would doubtless have felt themselves bound to sit throughout the negotiations if they had considered that the agreement would be binding upon their respective unions prior to the execution of the written contract. Instead, they came and went at will, and none were present when the final and crucial "Duration" paragraph was agreed to by Clinton and Carter. Certainly until that was agreed on there was no binding contract as to any provision, for it was expressly stipulated "that the alleged collective bargaining contract was 'entire' and not severable.'" The letter of authorization had also reserved to each business agent the right to terminate the authorization "prior to execution of the proposed contract." That strongly indicated that the proposed contract was not binding on any one of the unions until it was executed in written form.

Moreover, there is a vital distinction in the field of collective bargaining between the authority of an agent to execute a written contract and his authority to agree to an unsigned contract. One of the reasons for that distinction is the federal policy to avoid prying into the internal affairs of a bargaining representative. See Maier Brewing Co., 45 Lab.Arb. 1115, 1123. So long as the agent's authority is limited to the execution of a written contract there exists an interval after oral agreement has been reached in which the wishes of the members of the union can be ascertained. That is reasonable because the agreement may vitally affect their livelihood over the years of its duration. During

---

4. Clinton was emphatic that there were to be twelve separate agreements:

"By the Court:

"Q. In other words, you would have twelve separate agreements?

"A. Yes, sir. That was what they desired, and that was the agreement that we reached as early as the first meeting, yes, sir."

the interval a vote of the membership can be taken in accordance with the by-laws of the Union. This is an intra-mural concern of the Union. The employer needs no further evidence of authority of the business agent than his signature to the written contract. It by no means follows that the business agent or the attorney has apparent authority to bind the Union orally to an unsigned contract. After all, such apparent authority is rarely necessary or material for the bargaining contract being "entire" rather than "severable," nothing is finally binding until agreement has been reached on every provision, and then, in ordinary course, there should not be any long interval before the written contract is either executed or rejected.

■ Whether a contract takes effect before a contemplated writing is executed depends on the intention of the parties.[5] As expressed by Professor Corbin:

"One of the most common illustrations of preliminary negotiation that is totally inoperative is one where the parties consider the details of a proposed agreement, perhaps settling them one by one, with the understanding during this process that the agreement is to be embodied in a formal written document and that neither party is to be bound until he executes this document. Often it is a difficult question of fact whether the parties have this understanding; and there are very many decisions holding both ways. These decisions should not be regarded as conflicting, even though it may be hard to reconcile some of them on the facts that are reported to us in the appellate reports. It is a question of fact that the courts are deciding, not a question of law; and the facts of each case are numerous and not identical with those of any other case."

1 Corbin on Contracts, § 30.

It has passed almost unnoticed that in the present instance the parties seem to have expressed their intention in the crucial "Duration" provision, which was the last item on which agreement was reached:

"This Agreement shall be effective for a period of 3 years *following the date of execution* and from year to year *thereafter,* unless either party shall give written notice to the other party at least 60 days prior to said expiration date, or at least 60 days prior to any subsequent anniversary renewal date (if there has been no termination of the said original expiration date) of intent to terminate this Agreement provided that as to the Employer's City Auditorium and Exhibit Building project only currently under construction in the City of Atlanta, Georgia, at the corner of Piedmont Avenue and Forrest Avenue, the terms of this Agreement shall apply and govern the obligations of the parties *until* that said project is completed." (Emphasis supplied.)

■ We are in accord with what Judge Friendly wrote for the Second Circuit on a similar question:

"That the parties plan later to sign an agreement does not preclude prior formation of the contract by signifying assent to an unsigned paper; the issue is one of intention, Mississippi & Dominion S. S. Co. v. Swift, 86 Me. 248, 29 A. 1063 (1894); Restatement (Second), Contracts § 26 (Tent. Draft No. 1, 1964), 1 Corbin, Contracts § 30 (1963); Llewellyn, On Our Case-Law of Contract: Offer and Acceptance, I, 48 Yale L.J. 1, 14 (1938). Considering the importance attached to signed contracts in the field of collective bargaining, H. J. Heinz Co. v. NLRB, 311 U.S. 514, 523–526, 61 S.Ct. 320, 85 L.Ed. 309 (1941), and § 8(d) of the Act, 29 U.S.C. § 158(d), the long-standing practice here of having contracts signed by the individual employers, the fact that the instant contracts were to be an extension and modifica-

5. 1 Williston on Contracts, 3rd ed., § 28A; 17 Am.Jur. 2nd Contracts, § 28; 17 C. J.S. Contracts, § 49; Annotation 122 A.L.R. 1232, 165 A.L.R. 759; Courtin v. Sharp, 5 Cir. 1960. 280 F.2d 345. 349.

tion of contracts so signed, and the doubtful enforceability of a two-year oral contract, we think no one really believed that the parties would be bound until the contracts were fully executed and delivered."

Genesco, Inc. v. Joint Council 13, United Shoe Wkrs. of Amer., 2 Cir. 1965, 341 F. 2d 482, 486.

The judgment is

Affirmed.