AINSWORTH, Circuit Judge:
In this Georgia diversity case plaintiff Charles C. Barton brought suit for actual and exemplary damages against defendant Chemical Bank, alleging that the bank converted a certificate of deposit in the principal amount of $200,000 issued by the bank in Barton’s name. Chemical Bank filed a motion to dismiss for failure to state a claim, which was opposed by Barton who moved for summary judgment in his favor. The district court, treating Chemical Bank’s motion as a motion for summary judgment, entered judgment in its favor and against Barton. Barton then brought this appeal.
On July 19, 1973, a real estate development loan in the amount of $8,000,000 was made by Chemical Realty Corporation, an affiliate of defendant Chemical Bank,[1] to Charles Barton and closed in Atlanta, Georgia. In connection with the loan Barton signed a note in the amount of the loan and a “Deed to Secure Debt and Security Agreement.” Paragraph 1.02 of the “Deed to Secure Debt and Security Agreement” provided that Chemical Realty Corporation would withhold a reserve of $2,324,500 from the $8,000,000 loan to pay current interest on the note and any taxes, fees or other assessments on the property as they accrue and are payable. The paragraph further provided that if the reserve became insufficient to pay such interest, taxes and assessments in full Barton will deposit with Chemical Realty such sums as may be required to cover these charges.[2] At the closing Chemical Realty Corporation determined that the $2,324,500 reserve may not be sufficient and therefore requested that from the funds advanced in connection with the loan Barton purchase a $200,000 certificate of deposit from Chemical Bank and pledge it with Chemical Realty Corporation *1332 to supplement the reserve. Accordingly, that same day Barton directed Chemical Bank by letter to purchase a one-year certificate of deposit for $200,000 and to deliver it to Chemical Realty Corporation “to hold under a pledge agreement which is being prepared by counsel for Chemical Realty Corporation.”[3] Pursuant to these instructions, Chemical Bank issued a certificate of deposit in Barton’s name for that amount and delivered it to Chemical Realty Corporation. Subsequently, on July 27, 1973, Caroline Muccio, the Mortgage Loan Administrator for Chemical Realty Corporation, sent Barton a receipt for the certificate of deposit.[4] Though Barton’s and Muccio’s letters indicated that Chemical Realty Corporation’s attorneys were preparing a pledge agreement covering the $200,000 certificate of deposit, no written pledge agreement was ever executed.
Shortly before the one-year certificate of deposit matured, Chemical Realty Corporation on July 10, 1974 wrote Barton confirming that proceeds of the certificate of deposit, “pledged by you to Chemical Realty Corporation,” would be applied to the purchase of a new certificate in the same amount with a maturity of sixty to ninety days depending upon whichever maturity has the highest prevailing interest rate. The letter requested that Barton sign and return the attached copy. Barton signed and returned the copy of the letter after editing it to indicate that new certificates with a sixty-day maturity should be purchased.[5] However, Barton did not edit that portion of the same sentence which referred to the certificate of deposit as being pledged to Chemical Realty Corporation. During the next two years, whenever Barton’s certificate of deposit matured, Chemical Realty Corporation delivered the maturing certificate to Chemical Bank directing Chemical Bank to deposit the interest in Barton’s account, to purchase a new certifi *1333 cate of deposit and to deliver it to Chemical Realty Corporation.[6]
During this three-year period Barton repeatedly received letters and documents from Chemical Realty Corporation stating that the certificate of deposit was pledged to Chemical Realty Corporation. Chemical Realty Corporation regularly sent Barton receipts for the certificates as issued, indicating that the certificates were “held to cover any deficiency in the Reserve for Interest, Taxes, Fees, and Assessments in CRC’s $8,000,000 land loan to Charles C. Barton.” At no time did Barton or anyone else dispute the fact that Chemical Realty Corporation held the certificate pursuant to a pledge agreement.
On March 12, 1976, when the current certificate matured, it was clear to Chemical Realty Corporation that deficiencies in the original reserve for the payment of interest, taxes, fees and assessments would occur prior to the maturity of any further certificates of deposit and prior to the maturity of the loan. Hence, on March 11, when Chemical Realty Corporation sent Chemical Bank the certificate of deposit which would mature on March 12, Chemical Realty Corporation instructed Chemical Bank to deposit the proceeds thereof in Chemical Realty Corporation’s account rather than purchase another certificate of deposit. In accordance with these instructions, Chemical Bank cashed and cancelled the certificate the next morning, March 12, 1976, and deposited the proceeds in Chemical Realty Corporation’s account. Amounts remaining in the original reserve account were insufficient to pay interest due upon the $8,000,000 loan after March 31,1976 and thereafter Chemical Realty Corporation commenced application of the proceeds from the certificate to payment of interest due.
On the afternoon of March 12, 1976 Barton, with his attorney, personally appeared at the Chemical Bank and demanded that the bank deliver to him the certificate of deposit or its proceeds. This was the first time in almost three years that Barton had even suggested that he regarded the certificate purchased with $200,000 of the original loan from Chemical Realty Corporation as anything other than pledged to Chemical Realty Corporation. After contacting Chemical Realty Corporation, which informed Chemical Bank that these funds had been continuously pledged to it, Chemical Bank declined to comply with Barton’s demands. Barton then filed the present suit.
The primary issue in this suit is whether a security agreement covering the certificate of deposit existed between Barton and Chemical Realty Corporation. If a security agreement existed, Chemical Bank’s payment of the proceeds of the certificate of deposit to Chemical Realty Corporation rather than to Barton was proper.[7]
The circumstances demonstrate that a valid security agreement covering the certificate of deposit was reached.[8] *1334 While Barton and Chemical Realty Corporation never signed a written pledge agreement, Georgia law permits enforcement of oral security agreements under certain conditions. Although the Georgia statute enacting the Uniform Commercial Code explicitly provides that a written security agreement is required for enforcing a security interest when the secured party lacks possession of the collateral, Ga.Code Ann. § 109A-9-203(l)(b), no similar requirement for enforcing a security interest is imposed when the secured party possesses the collateral, id. § 109A-9-203(l)(a). The Official Comments indicate that the omission of a provision for a written security interest when the creditor possesses the collateral was intended to allow oral security agreements.
Where the collateral is in the possession of the secured party, the evidentiary need for a written record is much less than where the collateral is in the debtor’s possession; customarily, of course, as a matter of business practice the written record will be kept, but, in this Article, as at common law, the writing is not a formal requisite. Subsection (l)(a), therefore, dispenses with the written agreement — and thus with signature and description — if the collateral is in the secured party’s possession.
Uniform Commercial Code 9-203, Comment 3.
Since it is undisputed that Chemical Realty Corporation had possession of the collateral, the certificate of deposit, Chemical Bank’s conduct was proper if the facts show that Barton and Chemical Realty Corporation reached an oral security agreement. Barton presents alternative arguments in his brief concerning the existence of an oral agreement with Chemical Realty Corporation. At times Barton contends that no oral agreement to create a security interest was ever reached. At other times Barton contends that a security agreement was reached but that the agreement conditioned the creation of a security interest on the completion of a written security agreement. However, we conclude that neither position is supported but that Barton and Chemical Realty Corporation reached- a binding oral security agreement covering the certificate of deposit.
A security agreement is defined as “an agreement which creates or provides for a security interest.” Ga.Code Ann. § 109A-9-105(l)(h). Hence, for a valid security agreement the parties need merely agree to create a security interest in the collateral. That an intent to create a security interest is the sole requisite for a security agreement[9] is further supported by an examination of the provision for a written security agreement when the secured party lacks possession of the collateral, Ga.Code Ann. § 109A-9-203(l)(b). A written security agreement satisfies this provision if the signed security agreement contains a description of the collateral. See Ga.Code *1335 Ann. § 109A-9-203(l)(b). See generally J. White & R. Summers, Handbook of the Law under the Uniform Commercial Code 789-90 (1972). The additional requirement of a description of the collateral is necessary to solve the evidentiary problem of identifying the collateral when the secured party lacks possession of it. However, in cases such as the present one, no conditions are imposed on the security agreement other than that the agreement creates a security interest. Further, the definition of agreement provided by the Uniform Commercial Code as enacted by Georgia provides the necessary guidance for establishing the existence of an agreement in this case:
“Agreement” means the bargain of the parties in facts as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act (Sections 109A-1-205 and 109A-2-208). Whether an agreement has legal consequences is determined by the provisions of this Act, if applicable; otherwise by the law of contracts (Section 109A-1-103). (Compare “Contract”.)
Ga.Code Ann. § 109A-1-201(3).
Cases concerning security agreements have concluded that a security agreement existed from a wide range of circumstances. See, e. g., In re Carmichael Enterprises, Inc., N.D.Ga., 1971, 334 F.Supp. 94, 103-05, aff’d, 5 Cir., 1972, 460 F.2d 1405. In one case where the secured party was not in possession of the collateral and, therefore, where a written security agreement was necessary, the financing statement and a directors’ resolution authorizing the corporation to sign the security agreement were found sufficient to satisfy the requirements for a security agreement. See In re Numeric Corp., 1 Cir., 1973, 485 F.2d 1328. In another case, allowing a bank to possess the pledged stock for a period of six years and executing a form hypothecation agreement in connection with the shares was held to be sufficient to constitute a security agreement. See Estate of Beyer v. Bank of Pennsylvania, 449 Pa. 24, 295 A.2d 280 (1973).
The facts in this action satisfy these liberal standards for determining if Barton and Chemical Realty Corporation reached a security agreement pertaining to pledge of the certificate of deposit. The affidavit of Michael Wechsler, Executive Vice President of Chemical Realty Corporation, states that at the July 19, 1973 closing of the original loan Barton agreed to purchase a $200,000 certificate of deposit from the defendant, Chemical Bank, and to pledge it to Chemical Realty Corporation. In his affidavit Barton concedes that he and Wechsler agreed to pledge the certificate although Barton adds that this agreement further contemplated the execution of a written security agreement. While no written security agreement embodying the agreement referred to in the affidavits was ever executed, other documents clearly reflect the understanding of Barton and Chemical Realty Corporation that the certificate was pledged. In a letter written to Chemical Bank on the day of the original closing, Barton gave the following instructions:
Withdraw from [the account in which the proceeds of the eight million dollar loan had been deposited] the sum of two hundred thousand dollars ($200,000) and purchase a one year Certificate of Deposit at 9% per annum issued by Chemical Bank. Please deliver this Certificate to Mr. Wechsler at Chemical Realty Corporation to hold under a pledge agreement which is being prepared by counsel for Chemical Realty Corporation.
When the first certificate of deposit was about to mature a year later, Barton signed and returned to Chemical Realty Corporation the July 10,1974 letter referring to the certificate as being pledged to Chemical Realty Corporation. The care with which Barton scrutinized the contents of this letter is shown by the fact that Barton edited other portions of the sentence in which this reference was made.[10]
The agreement to pledge the certificate is also demonstrated “by implication from *1336 other circumstances.” See generally Ga. Code Ann. § 109A-1-201(3). A pledge agreement covering the certificate of deposit is entirely consistent with the “Deed to Secure Debt and Security Agreement” Paragraph 1.02, which explicitly requires that Barton supplement the reserve account whenever it was insufficient to pay anticipated interest, taxes, and other assessments in full. Also, whenever a new certificate of deposit was issued, Barton was advised by Chemical Realty Corporation of the debit and credit procedures in a letter referring to the certificate as pledged. During the three years prior to his demand on Chemical Bank for the certificate of deposit, Barton gave no indication to Chemical Realty Corporation or to Chemical Bank that he disagreed with the understanding that Chemical Realty Corporation held the certificate of deposit pursuant to a pledge agreement. Finally, during this period Barton raised no objection to Chemical Realty Corporation’s treating the certificate of deposit as pledged to it. Chemical Realty Corporation retained uninterrupted possession of the collateral and directed the application of the certificate’s proceeds upon its maturity. See Estate of Beyer v. Bank of Pennsylvania, 449 Pa. 24, 295 A.2d 280 (1973). These circumstances strongly confirm that Barton and Chemical Realty Corporation had reached a security agreement concerning the $200,000 certificate of deposit, and that it was held in pledge.
But Barton contends that even if a security agreement concerning the certificate of deposit was reached, the effectiveness of that agreement was conditioned on the execution of a written security agreement. To support this position Barton cites his July 19, 1973 letter to Chemical Bank in which he instructs: “Please deliver this Certificate to Mr. Wechsler at Chemical Realty Corporation to hold under a pledge agreement which is being prepared by counsel for Chemical Realty Corporation.” Barton also relies on the letter of July 27, 1973 to him from Chemical Realty Corporation which states: “Our attorneys are working on a pledge agreement which should be ready in another week or so.” Since a written security agreement was never completed, Barton urges that the security interest was therefore ineffective.
We conclude, however, that the effectiveness of the agreement reached by Barton and Chemical Realty Corporation was not actually conditioned on the execution of a written agreement. A security interest attaches as soon as the parties reach an agreement, the creditor gives value and the debtor has rights in the collateral “unless explicit agreement postpones the time of attaching.” Ga.Code Ann. § 109A-9-204(1). Barton views the July 19, 1973 letter to defendant Chemical Bank as an explicit instruction postponing attachment. However, the statement that “a pledge agreement ... is being prepared” is not an explicit instruction that the security interest is not to attach until the oral agreement of the parties is placed in written form. Further, the security agreement had to be reached between Barton and Chemical Realty Corporation, not between Barton and Chemical Bank. Thus, a letter to Chemical Bank cannot postpone the time when Chemical Realty Corporation’s security interest in the collateral would attach.
Furthermore, while Barton and Chemical Realty Corporation may have contemplated a written security agreement incorporating the oral agreement reached between them, the district court properly held that such an expectation would not render the oral agreement ineffective. At common law an oral contract may be enforceable despite the contemplation of a subsequent written contract. See Warrior Constructors, Inc. v. International Union of Operating Engineers, Local 926, 5 Cir., 1967, 383 F.2d 700, 708; Tymon v. Linoki, 16 N.Y.2d 293, 266 N.Y.S.2d 357, 213 N.E.2d 661 (1965). When the expected written contract is only evidence of the oral agreement, the contract is binding once the parties have reached an oral agreement. See V’Soske v. Barwick, 2 Cir., 1968, 404 F.2d 495, 499, cert. denied, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969). See also Hart v. Doss Rubber & Tube Co., 32 Ga.App. 314, 123 S.E. 751 (1924); Campbell & Co. v. Mion Bros., 6 Ga.App. 134, 64 S.E. 571 (1909); In *1337 re Numeric Corp., 1 Cir. 1973, 485 F.2d 1328.
The conduct of the parties indicates that the written agreement in this case was regarded as merely evidence of the oral agreement previously reached. Barton and Chemical Realty Corporation subsequently acted in a way that indicated that a binding pledge agreement existed despite the failure to put it in writing. Without waiting for the execution of a written pledge, Barton purchased the certificate of deposit from Chemical Bank and had it sent to Chemical Realty Corporation. For a period of three years, Chemical Realty Corporation treated the certificate of deposit as if the certificate was pledged to it and without objection from Barton. Only after it was necessary for Chemical Realty Corporation to obtain the proceeds of the collateral did Barton for the first time assert that a written security agreement was essential to completion of the pledge. In our view the circumstances make it clear that the agreement was to be effective despite the failure to execute a written pledge agreement.
[H] Even if a written agreement was found to have been originally a condition to the creation of a security interest, Barton’s subsequent conduct waived this condition and he is now estopped from asserting it. Although Barton states in his brief that “[wjhere there is no duty to speak, silence can have no effect,” the law is to the contrary and a party standing silent while the other party to the contract fails to perform a condition will be estopped from later asserting the condition.
In Storey v. Austin, 221 Ga. 692, 146 S.E.2d 728 (1966), the lessor attempted to deny renewal of a lease because the lessee failed to give written notice as required in the lease. The court held that a lessor who received oral notice of the lessee’s intent to renew could not remain silent about the lessee’s failure to give written notice until it was too late for the lessee to put his oral notice into writing. In another case, the defendant refused to pay for modifications in a construction project because the contract stated that the plans could only be modified by written agreement and in this case the plaintiff had acted on an oral agreement. The court found that the defendant’s actions had waived the requirements of a written modification.
In McDaniel v. Mallary Bros. Machinery Co., supra, it was pointed out that the invoking of a stipulation in a contract similar to the one here relied on by the defendant, after the performance of the contract by the plaintiff and the performance of extra work on the promise of the defendant to pay therefor, in effect, works a forfeiture of the plaintiff’s rights to recover for such extras. As there said, “forfeiture of rights is not favored, and the courts will readily seize upon circumstances arising in the subsequent conduct or transactions of the parties, and imply a waiver, in order to prevent a forfeiture because of noncompliance with formal prerequisites.” [6 Ga.App. 848, 66 S.E. 146.] Applying these principles to the instant case, the defendants ought not to be allowed to rely on the requirement of the original contract that changes in the specifications and additions to the contract must be in writing where by a course of conduct consisting of entering into an oral agreement with the plaintiff for changes they induced the plaintiff to make the changes in reliance upon their contemporaneous promise that they would pay therefor, and where they thereafter accepted the building as thus changed. To permit them to thus lull the plaintiff into a false sense of security by a reliance upon their promise to pay and their acceptance of the work and then to invoke the defense that the plaintiff had failed to comply with the formal prerequisites before making the changes and that they w.ere not, therefore, bound to pay therefor would be unconscionable, and the court should seize upon these very circumstances to imply a waiver by the defendants of the formal requirement that such changes be in writing.
Bailey v. Martin, 101 Ga.App. 63, 68-69, 112 S.E.2d 807, 810-11 (1960). See also State Highway Dep’t v. Hall Paving Company, 127 Ga.App. 625, 194 S.E.2d 493 (1972).
*1338 Therefore, Barton’s conduct estops him from now raising for the first time Chemical Realty Corporation’s failure to provide a written security agreement. Although no written agreement was executed, Barton remained silent about it for almost three years obviously knowing that Chemical Realty Corporation considered the pledge agreement as valid. Barton never contested Chemical Realty Corporation’s right to treat the certificate as pledged to it. Only when Chemical Realty Corporation exercised its right to the proceeds of the certificate did Barton take the position that no security agreement existed between him and Chemical Realty Corporation.
Estopping Barton from relying on the failure to fulfill the alleged condition is especially appropriate here since Barton is attempting by this suit to place the loss for the lack of a written security agreement upon Chemical Bank rather than Chemical Realty Corporation under his theory of conversion. The security agreement pertaining to the $8,000,000 loan involved only Barton and Chemical Realty Corporation. Chemical Bank was not responsible for satisfying the condition of supplying a written document. Further, any benefits of the loan which this collateral secured accrued to Chemical Realty Corporation, not the bank.
Barton cannot now be heard to argue that there was no pledge agreement covering the certificate of deposit since his conduct in dealing with Chemical Bank led the bank to believe that such an agreement existed with Chemical Realty Corporation. The initial letter from Barton to Chemical Bank directed the bank to deliver the certificate of deposit to Chemical Realty Corporation immediately. Though Barton indicated in his letter that a pledge agreement is being prepared, the letter provides no indication that Chemical Bank should delay delivery of the certificate to the secured party, Chemical Realty Corporation, until that agreement was completed. In addition, the letter does not instruct Chemical Bank that it is under any obligation to ascertain later if the pledge agreement was executed. Since the security agreement is between Barton and Chemical Realty Corporation, Chemical Bank would ordinarily not expect to be informed of its execution. Barton’s subsequent conduct continued to lead Chemical Bank to believe that the certificate was pledged because no objection was ever raised to Chemical Realty Corporation’s treatment of the certificate as pledged by redeeming and purchasing new certificates from time to time. Only after Chemical Bank paid the proceeds of the certificate of deposit over to Chemical Realty Corporation did Barton inform Chemical Bank that a security agreement had never been reached.[11] Under these circumstances, Barton is estopped from contending that Chemical Bank acted improperly in treating the certificate of deposit as pledged to Chemical Realty Corporation.
We conclude that the district court was correct in determining that Chemical Bank’s payment of the certificate of deposit to Chemical Realty Corporation did not constitute conversion of Barton’s property. Accordingly, the judgment below is
AFFIRMED.

. Although subsidiaries of a common parent, Chemical Realty Corporation and Chemical Bank are distinct legal entities. Chemical Bank was not shown to be a party to any negotiations or agreements between Barton and Chemical Realty Corporation and had no knowledge of the relationship between Barton and Chemical Realty Corporation except as represented to it by Barton and Chemical Realty Corporation.

. Paragraph 1.02 of the “Deed to Secure Debt and Security Agreement” reads:
1.02 Reserve Account. To further secure the payment of interest on the indebtedness evidenced by the Note and the taxes, assessments, ground rents and standby commitment fees hereinafter referred to, Grantor hereby authorizes and directs Grantee to disburse, from the proceeds of the indebtedness evidenced by the Note, funds in the amount of Two Million Three Hundred Twenty-four Thousand Five Hundred and No/100 Dollars ($2,324,500.00), such funds to be disbursed at such times and from time to time as needed for the purposes hereinafter described and such funds to be deposited with Grantee, or with a nominee designated in writing by Grantee: said deposits to be held by Grantee or by said nominee, as the case may be, free of interest, and free of any liens or claims on the part of creditors of Grantor and as part of the security of Grantee, and to be used by Grantee or by said nominee, as the case may be, to pay current interest on the indebtedness evidenced by the Note as such accrues and is payable, current taxes and assessments on the Premises as the same accrue and are payable, rentals due under the Ground Lease or any other leasehold estate or instrument given as additional security for the indebtedness evidenced by the Note as the same accrue and are payable and additional nonrefundable commitment fees payable pursuant to Paragraph 9 of the Phipps Commitment. Said deposits shall not be, nor be deemed to be, trust funds but may be commingled with the general funds of Grantee, or of said nominee, as the case may be. If said deposits are insufficient to pay such interest, taxes and assessments, ground rents and additional nonrefundable commitment fees in full as the same become payable, Grantor will deposit with Grantee or with said nominee, as the case may be, such additional sum or sums as may be required in order for Grantee or for said nominee, as the case may be, to pay such interest, taxes and assessments, ground rents and additional non-refundable commitment fees in full. Upon any default in the provisions of this Deed to Secure Debt and Security Agreement or the Note, Grantee, or said nominee, as the case may be, may at its option apply any money in the fund resulting from said deposits to the payment of the indebtedness secured hereby in such manner as it may elect.

. In relevant part Barton’s letter to Chemical Bank of July 19, 1973 reads:
Reference is made to the $8,000,000 mortgage loan being closed today. We hereby authorize that $5,175,500 in loan funds being advanced today be deposited by Chemical Realty Corporation into my account # 006-385915 to be withdrawn as follows:
1. Withdraw from my said account the sum of two hundred thousand dollars ($200,-000.00) and purchase a one year Certificate of Deposit at 9% per annum issued by Chemical Bank. Please deliver this Certificate to Mr. Wechsler at Chemical Realty Corporation to hold under a pledge agreement which is being prepared by counsel for Chemical Realty Corporation.

. The July 27, 1973 letter from Muccio of Chemical Realty Corporation to Barton stated:
Dear Mr. Barton:
I have enclosed your receipt for the referenced Certificate of Deposit which is being held by us.
Our attorneys are working on a pledge agreement which should be ready in another week or so.
If you have any questions or comments, please advise.
Very truly yours,
Caroline M. Muccio
Mortgage Loan Administrator
The enclosed receipt from Chemical Realty Corporation to Barton described the certificate of deposit as “held to cover any deficiency in the Reserve for Interest, Taxes, Fees, and Assessments in CRC’s $8,000,000 land loan to Charles C. Barton.”

. The following is the letter sent by Chemical Realty Corporation to Barton dated July 10, 1974. The underlined portions were deleted by Barton in the copy returned to Chemical Realty Corporation:
Dear Mr. Barton:
In accordance with your recent phone conversation with Mr. Michael J. Wechsler, I have instructed Chemical Bank to renew the $200,000 Certificate of Deposit pledged by you to Chemical Realty Corporation for a period of 60 to 90 days depending upon whichever maturity has the highest prevailing interest rate at the time of issuance.
The interest on the maturing Certificate of Deposit will be credited to your account at Chemical Bank # 006-385915 and you will receive notification from Chemical Bank specifying the date of such deposit as well as the amount within the next two weeks.
The receipt issued to you by Chemical Realty Corporation for the $200,000 Certificate of Deposit is hereby null and void and another receipt will be issued to you for the new Certificate of Deposit upon our receipt thereof.
Please signify your concurrence with the foregoing by signing the attached copy of this letter and returning to the undersigned. Very truly yours,
/s/ Caroline M. Muccio
Caroline M. Muccio
Mortgage Loan Officer

. Each time a new certificate of deposit was issued, Chemical Realty Corporation sent Barton a letter advising him of the transaction. These letters also referred to the certificate as pledged to Chemical Realty Corporation. Typical of these letters is the letter of July 15, 1975 reproduced below:
Dear Mr. Barton,
Enclosed please find the credit and debit advices regarding the Certificate of Deposit with Chemical Bank that is pledged to Chemical Realty Corporation.
Very truly yours,
GHMcG:mc

. The existence of a security agreement would immunize the conduct of Chemical Bank from liability for conversion. Except as otherwise provided by this Act a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors. Ga.Code Ann. § 109A-9-201. See also Thompson v. Ford Motor Credit Co., D.S.C., 1971, 324 F.Supp. 108 (security agreement exempted creditor from any liability for conversion of any personal property seized during repossession of a car).
Barton did not contend in the district court that he was not in default at the time the certificate of deposit was redeemed for Chemical Realty Corporation’s account. The district judge explicitly stated in his opinion that “The plaintiff does not contend that he was not in default on his loan and the CRC could not have claimed the funds if it had a valid security interest in them.” Barton makes this contention for the first time on this appeal.

. Since a federal court sitting in diversity applies the conflict rules of the state in which the *1334 suit is brought, Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), Georgia choice of law rules apply to this action. Chemical Bank contends that New York law should control since Georgia applies the law of the place where the tort has been committed, Wardell v. Richmond Screw Anchor Co., 133 Ga.App. 378, 210 S.E.2d 854 (1974), and since the alleged conversion of the certificate of deposit occurred in New York. Although Barton does not address the choice of law question, we do not agree that New York law should control. The dominant issue in this case is whether the certificate of deposit was covered by a security agreement rather than the alleged conversion of the certificate. In cases involving contracts Georgia applies the law of the state in which the contract was entered. See, e. g., Hollis v. Covenant Bldg. & Loan Ass’n, 104 Ga. 318, 31 S.E. 215 (1933).
The security agreement involving Barton was made in Georgia. In addition, the loan involved Georgia real estate and the closing occurred in Georgia.
Disposition of this case is not thereby affected since both New York and Georgia have enacted the Uniform Commercial Code and their laws appear fully in agreement on the various legal principles at issue.

. The parties can include many additional provisions in a security agreement. See Ga.Code Ann. § 109A-9-201. In most cases the security agreement will be “as long as the creditor’s arm and as broad as counsel’s imagination.” J. White & R. Summers, Handbook of the Law under the Uniform Commercial Code 956 (1972). See also id. 789-90. However, these extra conditions are not essential to the validity of a security agreement.

. The edited letter is reproduced in footnote 5.

. During oral argument Barton’s counsel argued that Chemical Bank paid the certificate of deposit after Barton’s demand for it. That contention is totally unsupported in this case. Barton presented no affidavit contradicting the affidavit of Kenneth Barentzen, Vice President of Chemical Bank, in which it is stated that the certificate was cashed on the morning of March 12. Barton did not appear at the bank to make his demand with his attorney until the afternoon of March 12.