**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HABERMAN CONSTRUCTION COMPANY, Respondent.**

No. 79–1120.

United States Court of Appeals, Fifth Circuit.

April 3, 1981.

Elliott Moore, Deputy Associate Gen. Counsel, Charles Donnelly, N. L. R. B., Washington, D. C., for petitioner.

Manitzas, Harris & Padgett, J. Joe Harris, San Antonio, Tex., for respondent.

Before GODBOLD, Chief Judge, BROWN, COLEMAN, AINSWORTH, CHARLES CLARK, RONEY, GEE, TJO-FLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON, THOMAS A. CLARK and WILLIAMS, Circuit Judges.

RANDALL, Circuit Judge:

In this case the National Labor Relations Board (the Board) seeks to enforce its order in *Haberman Construction Co.*, 236 N.L.R.B. 79 (1978). Adopting the findings of the administrative law judge, the Board found that Haberman Construction Co. (the Company) had by its actions adopted a prehire contract in effect between Local 1266 of the United Brotherhood of Carpenters and Joiners of America (the Union) and the Austin Chapter of the Associated General Contractors (the AGC). On this basis, the Board found that the Company had committed unfair labor practices by unilaterally refusing to make further union benefit payments as required by the Union-AGC contract, by announcing to its employees that it intended to go "open shop," and by constructively discharging certain employees who resigned in response to the Company's decision to cease union benefit payments and to go "open shop." Although the Board generally adopted the remedies proposed by the administrative law judge, it rejected his suggestion that, since the projects on which the employees had been working were in all likelihood completed by the time of his decision, the employees should be made whole only for losses incurred until the end of those projects. Rather, the Board ordered that those employees who would have continued in the Company's employment but for the unfair labor practices be reinstated to substantially equivalent positions on new projects and that they be made whole for all losses incurred by them as a result of the unfair labor practices (such losses not being limited to the projects under way at the time of the unfair labor practices).

A panel of this court granted the Board's petition to enforce its order in *NLRB v. Haberman Construction Co.*, 618 F.2d 288 (5th Cir.), *vacated and rehearing en banc granted* (July 15, 1980). The panel enforced the Board's order in all respects. In so doing, the panel interpreted the Board's opinion as having adopted the rule that a prehire contract between a project-by-project employer in the construction industry and a union, entered into pursuant to section 8(f) of the National Labor Relations Act (the Act), becomes and continues thereafter to be an ordinary section 9(a) collective bargaining agreement once the union has achieved majority status in the relevant bargaining unit. As a section 9(a) agreement, the panel reasoned, a presumption of continuing union majority applies, and the union is not required to establish its majority status at each succeeding job site in order to enforce its contract with the employer. Accordingly, the panel concluded that the Board's remedy approximately extended to projects not yet begun at the time of the unfair labor practices.

We have reheard this case *en banc* primarily to consider whether the panel misinterpreted the remedial portion of the order and opinion of the Board in this case. For the reasons set forth below, we have decided that the panel did misinterpret the order and opinion of the Board. Further, reading the Board's order in the context of the explanation provided in its opinion and of its own prior precedents, we conclude that we cannot enforce that portion of the Board's remedial order which extends to projects not yet begun at the time of the unfair labor practices at issue.

### The Facts

The dispute in this case derives from the disruption of the relationship between the Company, a construction firm operating in Austin, Texas, and the Union. This relationship had its origin in 1973 when the Company hired Jessie Beshears, a union member, to be its carpenter foreman, and began paying Beshears' benefits into the carpenters' welfare, pension and apprentice

training fund in accordance with the contract then in effect between the Union and the AGC. Under Beshears' tutelage, this burgeoning relationship grew to significant proportions since Beshears, according to his own testimony, hired "strictly union carpenters." Some of the Company's growing complement of union carpenters were hired by Beshears on the basis of his personal knowledge of their work; others were procured through his use of the union hiring hall.

Although the Company never formally executed a collective bargaining agreement with the Union, and despite the fact that respondent was not a member of the AGC, by May 1973 respondent was remunerating its carpenters at the pay scale provided by the Union-AGC contract. Furthermore, when this contract expired on August 31, 1974, and was replaced by a contract effective from September 1, 1974, through March 31, 1977, the Company instituted the new contract's higher wage scale. The Company also submitted payments for its carpenters' benefits to the Union and allowed the employees to maintain a job steward at the worksite.

This amicable relationship ended abruptly on February 14, 1977. On that date, the Company informed its carpenters that it would cease paying for their union benefits, and that it was going "open shop." In response, the carpenters sought the advice of their union business agent. Acting on his advice, at the end of business on February 16, 1977, five of the Company's carpenters relinquished their positions because of the Company's actions.

The Union's charges of unfair labor practices were tried before an administrative law judge. He found that in February, 1977, the Company operated two Austin projects and that the carpenters employed at these two projects constituted one bargaining unit because the employees were freely shifted by the Company between the two projects. He further found that on the date of the discharges, the Union represented at least seven of the eleven rank-and-file carpenters in this unit. Hence, it represented a majority of the employees.

The administrative law judge found that the Company was a project-by-project employer, having no regular complement of workers but rather hiring as the need arose. The Company's two Austin projects were almost completed at the time of the unfair labor practices and were considered by the administrative law judge to have been completed by the time of the administrative hearing.

The administrative law judge also found that the Company had adopted the Union-AGC contract. Since the Union enjoyed majority status at the time of the breach of this contract, the administrative law judge concluded that the Company's unilateral cessation of paying union benefits constituted a refusal to bargain in violation of section 8(a)(1) and (5) of the Act; that the Company's announcement that it was going "open shop" was coercion in violation of section 8(a)(1) of the Act; and that the Company's unilateral changes in terms and conditions of employment constituted a constructive discharge of the five employees who quit their employ, and thus amounted to a discriminatory discharge in violation of section 8(a)(1) and (3) of the Act.

After adopting the administrative law judge's findings as to the violations, the Board ordered the Company to reinstitute the terms and conditions of the Union-AGC contract, to reinstate the five discharged employees and to make them whole for the projects under way at the time of the violations and for new projects on which they would have been hired but for the violations, and to bargain with the union.

### I. Existence of a Collective Bargaining Agreement

■ It is well settled that a union and employer's adoption of a labor contract[1] is

---

1. By use of the term "labor contract" here, we refer to both a collective bargaining agreement and a section 8(f) prehire contract. Section

8(f) of the Act, 29 U.S.C. § 158(f) (1976), provides:

It shall not be an unfair labor practice under subsections (a) and (b) of this section

356

not dependent on the reduction to writing of their intention to be bound. *See, e. g., Certified Corp. v. Hawaii Teamsters Local 996*, 597 F.2d 1269, 1272 (9th Cir. 1979); *Warrior Constructors, Inc. v. Operating Engineers Local 926*, 383 F.2d 700, 708 (5th Cir. 1967); *Rabouin v. NLRB*, 195 F.2d 906, 910 (2d Cir. 1952). Instead, what is required is conduct manifesting an intention to abide by the terms of an agreement. *See, e. g., Warrior Constructors, Inc., supra*, 383 F.2d at 708–09; *NLRB v. George E. Light Boat Storage, Inc.*, 373 F.2d 762, 766 (5th Cir. 1967); *Rabouin, supra*, 195 F.2d at 909–10.

■ The conclusion that the Company manifested an intent to abide by the Union-AGC contract, by enjoying its benefits and abiding by its provisions, *see id.* at 910, is well supported by the findings of the administrative law judge:

[T]he evidence in the instant case of Respondent's adoption of the Union-AGC agreement must be regarded as substantial. Respondent's contributions to the Union's trust funds from May 1973 through February 1977, its use of union members exclusively as far as the record shows, it [sic] observations of the Union-AGC holidays, its use of the union for referrals, its payment of the union wage scale, its allowance through Beshears of the appointment of a union job steward, and the undisputed testimony of Beshears, whom I credit, to the effect that on

some but not all occasions when he wanted to start work at an earlier hour than called for in the union agreement he will check with business agent Rosentritt, all reflects [sic] an intention to adhere to the terms of the Union-AGC agreement.

Since these findings are supported by substantial evidence on the record as a whole, *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), we conclude that the Company had adopted the Union-AGC contract.[2]

The Company asserted below that it was free to repudiate the Union-AGC contract because its adoption of that agreement did not create a collective bargaining agreement, but created instead a "prehire contract." It is true that section 8(f) of the Act creates a unique situation with respect to the formation of contracts between employers in the building and construction industry and unions. Section 9(a) of the Act, which otherwise would govern, provides that the exclusive representative of all the employees in a bargaining unit shall be the "representatives designated or selected for the purposes of collective bargaining by the majority of the employees" in the unit. 29 U.S.C. § 159(a) (1976). Accordingly, the Supreme Court has held that it is an unfair labor practice for an employer under section 8(a)(1) and (2) and for a union under section 8(b)(1)(A) to enter into a collective bargaining agreement recognizing the union as the

for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later . . . *Provided*, That nothing in this subsection shall set aside the final proviso to subsection (a)(3) of

this section: *Provided further*, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

2. We need not here decide whether the Company's payment of the wage scale and benefits provided by the Union-AGC contract would in itself indicate respondent's intention to be bound by that agreement. *Cf. Roadway Express, Inc. v. Teamsters Local 249*, 330 F.2d 859, 865 (3d Cir. 1964) (acceptance of wages by employees does not bind labor union on issue of existence of labor contract). Rather, we focus on the fact that respondent both enjoyed the benefits of the contract and abided by its provisions. *See Rabouin, supra*, 195 F.2d at 910.

exclusive bargaining representative when only a minority of the employees have authorized the union to represent them. *Garment Workers v. NLRB*, 366 U.S. 731, 737, 81 S.Ct. 1603, 1607, 6 L.Ed.2d 762 (1961). Section 8(f) of the Act specifically provides, however, that it shall not be an unfair labor practice for an employer to make an agreement with a labor organization covering employees engaged in the building and construction industry prior to the establishment of majority status for the labor organization. In *NLRB v. Local 103, International Association of Bridge Workers (Higdon Construction Co.)*, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978), the Supreme Court determined the binding effect of prehire contracts entered into pursuant to section 8(f). The Court adopted the longstanding position of the Board that a section 8(f) prehire contract is voidable until such time as the union achieves majority support in the appropriate bargaining unit. *Id.* at 341, 98 S.Ct. at 655–656. The Court made clear, however, that "when the union successfully seeks majority support, the prehire agreement attains the status of a collective-bargaining agreement executed by the employer with a union representing a majority of the employees in the unit." *Id.* at 350, 98 S.Ct. at 660. Since a majority of the employees in the relevant unit in the Company's employment supported the Union on February 14, 1977, the Company's actions of that date were taken in the face of a valid collective bargaining agreement.

## II. *The Unfair Labor Practices*

### A. *Cessation of Benefit Payments*

■ It is well settled that an employer violates section 8(a)(1) and (5) of the Act, 29 U.S.C. § 158(a)(1), (5) (1976),[3] by unilaterally changing the terms and conditions of employment without first granting its employees' exclusive bargaining representative the opportunity to bargain about "mandato-

ry" subjects. *See, e. g., NLRB v. Katz*, 369 U.S. 736, 747–48, 82 S.Ct. 1107, 1114, 8 L.Ed.2d 230 (1962). It is equally well established that contributions to a health, welfare and pension fund constitute mandatory subjects of collective bargaining. *See, e. g., NLRB v. SAC Construction Co.*, 603 F.2d 1155, 1156 (5th Cir. 1979); *Winn-Dixie Stores, Inc. v. NLRB*, 567 F.2d 1343, 1349 (5th Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978); *United Brick & Clay Workers v. District 50, UMW*, 439 F.2d 311, 314 (8th Cir. 1971); *Hinson v. NLRB*, 428 F.2d 133, 137 (8th Cir. 1970).

Given the existence of these two principles, we have no difficulty in affirming the Board's finding of an unfair labor practice here, for the Company does not dispute that it ceased payments of the benefits without bargaining with the Union. Since that action accomplished a unilateral alteration in terms and conditions of employment which are mandatory subjects of bargaining, the Company violated section 8(a)(1) and (5) of the Act.

### B. *"Open Shop" Announcement*

■ The Board found that the Company's communication of its intention to go "open shop" coerced its employees in violation of section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1),[4] because "such announcement by Respondent conveyed to employees an intent of Respondent to refuse to abide by the terms of an applicable contract and to discontinue dealing with a union with which it was obligated to deal." In contrast, the Company contends that its statement was simply an announcement of its intention to abide by the Texas "right to work law" which prohibits closed shops. *See* Tex.Stat. Ann. art. 5207a (Vernon 1971).

In essence the Company asks us to reject the Board's inference that its statement conveyed an intention to repudiate its bar-

---

**3.** It shall be an unfair labor practice for an employer—

　(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

　(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

**4.** The text of section 8(a)(1) of the Act is reprinted at note 3, *supra*.

gaining obligations. Even were we to disagree with the Board's assessment of the character of the Company's statement, we cannot reverse its finding, for it is not the province of this court to substitute its judgment for that of the Board when the Board has drawn a plausible inference from competent evidence. *See, e. g., NLRB v. United Insurance Co.*, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). Indeed, we find the Board's inference to be quite plausible. Given the fact that the Company's announcement was made simultaneously with its repudiation of its obligation to pay the carpenters' benefits, its statement is quite easily interpreted as a message to its employees that it would not recognize and bargain with the Union. The Board's inference of coercion is supported by substantial evidence on the record as a whole.[5]

### C. Constructive Discharge

■ There are two elements to a constructive discharge violative of section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3) (1976).[6] First, the employer's conduct must have created working conditions so intolerable that an employee is forced to resign. Second, the employer must have acted "to encourage or discourage membership in any labor organization" within the meaning of section 8(a)(3) of the Act. *See, e. g., Cartwright Hardware Co. v. NLRB*, 600 F.2d 268, 270 (10th Cir. 1979); *J. P. Stevens & Co. v. NLRB*, 461 F.2d 490, 494 (4th Cir. 1972); *NLRB v. Holly Bra of California, Inc.*, 405 F.2d 870, 872 (9th Cir. 1969); *Montgomery Ward & Co. v. NLRB*, 377 F.2d 452, 459 (6th Cir. 1967); *NLRB v.*

*Tennessee Packers, Inc., Frosty Morn Division*, 339 F.2d 203, 204–05 (6th Cir. 1964). We must therefore determine whether the Company's conduct created intolerable conditions and was accomplished to discourage union membership.

### 1. Intolerable Conditions

Five of the Company's employees resigned in response to the Company's decision to go "open shop" and to unilaterally cease payment of all union benefits. Although the payment of union benefits was a mandatory subject of bargaining, *see* Part II(A) of this opinion, we need not decide whether that fact alone would render the cessation of such payments an "intolerable condition" sufficient for a finding of a constructive discharge. As discussed above, the administrative law judge also found that the Company's announcement that it intended to go "open shop" conveyed to its employees an intent to refuse to abide by the terms of a binding labor contract and to refuse to deal with the union with which it was obligated to deal, and thereby forced the Company's employees to choose between quitting its employ or continuing in the face of the Company's unlawful repudiation of its bargaining obligations under the Act. The Board has repeatedly held that employees who decide to quit in circumstances similar to those in this case have been constructively discharged. *See, e. g., Superior Sprinkler, Inc.*, 227 N.L.R.B. 204 (1976) (refusal to negotiate new collective bargaining agreement, and unilateral cessation of contributions to the union's vacation fund and health and welfare fund); *Mar-*

5. The Company contends that its "open shop" announcement is speech protected by section 8(c) of the Act, 29 U.S.C. § 158(c) (1976), which provides that "[t]he expressing of any views, argument, or opinion . . . shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit." This argument is merely a reformulation of the Company's attack on the Board's finding of coercion because section 8(c) does not protect speech which is in itself coercive. *See generally* R. Gorman, Basic Text on Labor Law Unionization and Collective Bargaining 148–51 (1976). Since we have ac-

cepted the Board's determination that the Company's announcement conveyed its intention to withdraw its recognition of the Union—its determination to commit an unfair labor practice—the statement is coercive and not protected by section 8(c).

6. Section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), in pertinent part, provides that "[i]t shall be an unfair labor practice for an employer—(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ."

*quis Elevator Co.*, 217 N.L.R.B. 461 (1975) (withdrawal of recognition from union with statement that employer would operate as nonunion shop, with institution of new wage guidelines and discontinuance of payments to various union trust funds); *Lifetime Shingle Co.*, 203 N.L.R.B. 688 (1973) (conditioning of continued employment upon employees' giving up union membership); *Barwise Sheet Metal Co.*, 199 N.L.R.B. 372 (1972) (conditioning of continued employment upon employees' giving up union membership); *Johnson Electric Co.*, 196 N.L.R.B. 637 (1972) (unilateral change in wages and benefits provided for in new contract, with requirement that employees work with nonunion workers under circumstances which would require employees to lose union membership); *Blue Cab Co.*, 156 N.L.R.B. 489 (1965), *enforced sub nom. Teamsters Local 782 v. NLRB*, 373 F.2d 661 (D.C. Cir.), *cert. denied*, 389 U.S. 837, 88 S.Ct. 54, 19 L.Ed.2d 100 (1967) (unilateral change in method of operation from use of commission drivers to nonunion lease arrangement, thereby forcing employees to choose between new conditions and union representation).

### 2. Conduct to Discourage Union Membership

The font of our analysis of the Company's motivation for its conduct is of course the paradigm for section 8(a)(3) established by the Supreme Court in *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967):

> First, if it can reasonably be concluded that the employer's discriminatory conduct was "inherently destructive" of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is "comparatively slight," an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justi-

fications for the conduct. Thus, in either situation, once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to some extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him.

*Id.* at 34, 87 S.Ct. at 1798.

Our research has revealed that at least two categories of conduct are "inherently destructive of important employee rights." One type of such conduct is that which jeopardizes the position of the union as bargaining agent or diminishes the union's capacity effectively to represent the employees in the bargaining unit. *Inter-Collegiate Press, Graphic Arts Division v. NLRB*, 486 F.2d 837, 845 (8th Cir. 1973), *cert. denied*, 416 U.S. 938, 94 S.Ct. 1939, 40 L.Ed.2d 288 (1974); *see Portland Willamette Co. v. NLRB*, 534 F.2d 1331, 1334 (9th Cir. 1976). This action "creates visible and continuing obstacles to the future exercise of employee rights." *Inter-Collegiate Press, supra*, 486 F.2d at 845 (footnote omitted); *Loomis Courier Service Inc. v. NLRB*, 595 F.2d 491, 495 (9th Cir. 1979). Examples of such conduct include the grant of super-seniority to returning strikers, *see NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963), the institution of fixed work shifts to non-striking workers, action that insured that the strikers, upon return, would be permanently relegated to less desirable shifts, *see NLRB v. Moore Business Forms, Inc.*, 574 F.2d 835, 840–41 (5th Cir. 1978), and the cessation of payments of insurance premiums for strikers, conduct which assured that the employees would be unable to obtain renewed insurance coverage for ninety days past the date of their reemployment. *See id.* at 841–42.

The second type of conduct inherently destructive of important employee rights is that which directly and unambiguously penalizes or deters protected activity. *Kaiser Engineers v. NLRB*, 538 F.2d 1379, 1386 (9th Cir. 1976); *Portland Willamette Co., supra*, 534 F.2d at 1334; *see NLRB v.*

*Lantz,* 607 F.2d 290, 299 (9th Cir. 1979); *Indiana & Michigan Electric Co. v. NLRB,* 599 F.2d 227, 232 (7th Cir. 1979). Examples of such action include discharges occurring because of the employees' expressed desire to obtain union assistance in attaining compliance with the collective bargaining agreement, *see Lantz, supra,* 607 F.2d at 299, and a discharge resulting from an employee's lobbying of legislators regarding changes in national policy affecting the employee's job security. *See Kaiser Engineers, supra,* 538 F.2d at 1384–86.

■ We have no difficulty placing the Company's action within both of these categories.[7] As we have discussed in Part II(A) and (B) of this opinion, the Company's conduct amounted to a repudiation of its bargaining obligation. It would be a complete contradiction to state that such action did not jeopardize the Union's position as bargaining agent or diminish its ability effectively to represent the carpenters. Furthermore, no conduct could more effica-

ciously convey to the employees the futility of engaging in concerted activity, and thereby directly and unambiguously deter the exercise of that right, the guarantee most fundamentally protected by the Act. From the carpenters' standpoint, it would be futile to engage in collective bargaining through a representative if the Company would repudiate any resulting agreement at will. Accordingly, the Company's conduct was inherently destructive of important employee rights, and no proof of antiunion motivation is required.[8]

### III. *The Remedy*

#### A. *Our Interpretation of the Board's Opinion in this Case*

The administrative law judge recommended the following remedies in his proposed order: that the Company cease and desist from its violations of the Act; that the Company bargain collectively and in good faith with the Union; that the Com-

---

**7.** In two prior cases involving an employer's unilateral diminution of wages and benefits, the courts have required proof of antiunion motivation to establish constructive discharges violative of section 8(a)(3). *See J. P. Stevens & Co. v. NLRB,* 461 F.2d 490, 494 (4th Cir. 1972); *NLRB v. Brennan's, Inc.,* 366 F.2d 560, 563 -65, *modified,* 368 F.2d 1004 (5th Cir. 1966). However, both cases are distinguishable from the instant action because in neither case was there a collective bargaining agreement in existence at the time of the employer's unilateral acts. Thus, the employer's conduct was not taken in abrogation of an existing collective bargaining agreement. As a result, the conduct did not have quite the devastating effect on employees' rights as that which we here condemn; rather, the conduct in those two cases had only a "comparatively slight" adverse effect on employee rights.

In *Cartwright Hardware Co. v. NLRB,* 600 F.2d 268 (10th Cir. 1979), proof of antiunion motivation was also required. The employer was found to have violated section 8(a)(5) of the Act because, without first bargaining with the union, he instituted a new wage and benefits schedule at the expiration of a collective bargaining agreement. At the same time, the employer announced that he would not abide by the contract's union security provision past the date of contract expiration. Subsequent to these actions, the union employees quit. The court required proof of antiunion motive because it found that the employees resigned not because of the unilateral wage and benefits

changes, but due to the employees' belief that "they could not work in an open shop without sacrificing their union memberships." *Id.* at 271. Since "a union shop provision does not survive contract termination," *id.* at 272, the employer's action did not deny the employees a right guaranteed by the Act. Proof of antiunion motivation was therefore properly required since the conduct was not inherently destructive of employee rights. In contrast, in this case, the Company's conduct violated the carpenters' rights under section 8(d) and thus was inherently destructive of the employees' rights.

**8.** The Company argues that no unfair labor practices should be premised on the resignation of the carpenters since the Union-AGC contract contained a grievance procedure. The short answer to this contention is that the existence of a contractual remedy does not deprive the Board of jurisdiction to condemn conduct which constitutes an unfair labor practice. *See Great Dane Trailers, supra,* 388 U.S. at 30 n.7, 87 S.Ct. at 1796 n.7.

The Company also argues that the carpenters should have remained on the job in order to "mitigate" the Company's liability. This argument is completely frivolous since it is totally at war with the constructive discharge doctrine. An employer may not impose intolerable conditions in his workplace and expect his employees to remain and acquiesce.

pany restore all terms which it had unilaterally changed in its agreement with the Union; that the Company pay the union benefits it had unlawfully refused to pay; and that the Company make whole the five employees it had forced to resign for any loss of wages or benefits caused by the Company's wrongful conduct. Because the jobs on which these employees had been working appeared to be completed, and because the Company was a project-by-project employer in the construction industry, the administrative law judge expressly declined to order reinstatement:

> From the record it appears that the jobs from which the employees were constructively discharged were almost completed at the time of the discharge and most likely by now, have been long since completed. Since it appears that the job complement of carpenters was not always the same from job to job reinstatement in the sense of restoring a carpenter to a particular job from which he has been discharged is neither practical or required.

236 N.L.R.B. at 87.

The Board adopted the proposed remedies of the administrative law judge but rejected his suggestion that remedies be limited to projects in progress at the time of the unfair labor practices. Instead, the Board ordered that those discriminatees who would have been rehired absent the Company's unfair labor practices be reinstated "to their former positions of employment or, if those jobs no longer exist, to substantially equivalent positions of employment." *Id.* at 80. The Board's rationale for this order was set out in four sentences in its opinion:

> We are aware that, even absent the unfair labor practices, Respondent, which hired employees on a project-by-project basis, might have discharged the discriminatees in the normal course of business when the projects were completed. How-

ever, there is a distinct possibility that, absent its discrimination, Respondent would have retained, transferred, or rehired at least some of the discriminatees for new projects. Accordingly, to remedy fully Respondent's unfair labor practices and protect the discriminatees' rights, we shall order Respondent to reinstate the discriminatees to their former or substantially equivalent positions and to make them whole for any losses they suffered as a result of the discrimination against them.... The determination of which employees, if any, would have continued in Respondent's employment and for how long can best be made at the compliance stage of the proceedings, to which we defer the matter.

*Id.* at 79 (footnotes omitted). This explanation was rendered without so much as a single citation to the Board's previous decisions or to those of the courts. Moreover, this extremely brief and unenlightening opinion was issued despite the order's possible conflict with a principle previously articulated by the Board—that a union must reestablish its majority status at each new jobsite before it can enforce a section 8(f) prehire agreement with a project-by-project employer. This principle, which is discussed in more detail *infra*, was clearly expressed by the Board in an opinion issued less than eight months before its decision in this case. *See Dee Cee Floor Covering*, 232 N.L.R.B. 421 (1977).

Although the remedial power of the Board is "a broad and discretionary one, subject to [a] limited judicial review,"[9] the Board may not order remedies which are in fact punitive. The purpose of a remedial order under the Act is to restore conditions that existed in the absence of unfair labor practices; a remedy which grants rights to which a party would not have been entitled in the absence of the violations is punitive as to the other party and is therefore unen-

---

**9.** *Fibreboard Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964). *See also NLRB v. J. H. Rutter-Rex Manufacturing*

*Co.*, 396 U.S. 258, 262–63, 90 S.Ct. 417, 419–420, 24 L.Ed.2d 405 (1969); *NLRB v. Pilot*

forceable.[10] In light of these principles, the holding of *Dee Cee Floor Covering* appears to preclude remedial relief which extends beyond the projects in progress at the time of the Company's unfair labor practices. If the Company was, as *Dee Cee Floor Covering* indicates, bound by the Union-AGC prehire contract only to the extent of the particular projects at which a union majority had been established, then it could lawfully have ended its relationship with the Union at the conclusion of those jobs. A remedy reaching future projects (on which a union majority was not yet established) would in effect hold the Company to a labor contract which has not become enforceable as to those projects. Such a remedy would be punitive rather than remedial and we therefore could not enforce it.

The panel opinion interpreted the Board's opinion in this case as having rejected the principle enunciated in *Dee Cee Floor Covering*. The panel found that the Board had instead adopted the rule that a section 8(f) prehire contract is transformed into an ordinary section 9(a) collective bargaining agreement when the union first achieves majority status in the relevant bargaining unit; the panel concluded that a presumption of continuing union majority applies to project-by-project employers in the construction industry despite the origination of their agreement in a section 8(f) prehire contract. Crucial to the panel's analysis, therefore, was its conclusion that the holding in *Dee Cee Floor Covering* has "met its well-deserved demise." 618 F.2d at 309.

■ Although the panel's reading of the Board's opinion in this case is a possible one,[11] we do not think it appropriate to read a change of that magnitude into such a brief and ambiguous opinion. The Board does not discuss or even cite *Dee Cee Floor Covering*, despite the dissent of one of its members on the basis that the Board's action conflicts with that case. 236 N.L.R.B. at 79 n.5 (Member Penello, dissenting). We recognize that the Board is authorized to change its mind and "modify its construction of the Act in light of its cumulative experience." *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 508, 98 S.Ct. 2463, 2477, 57 L.Ed.2d 370 (1978). But "when it does it must at least carefully explain its reasons, justify the change and follow con-

---

*Freight Carriers, Inc.*, 604 F.2d 375, 377 (5th Cir. 1979).

**10.** Section 10(c) of the Act, 29 U.S.C. § 160(c) (1976), requires the Board upon finding that an unfair labor practice has been committed "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of [the Act]." The Board's duty under § 10(c) is to make "the employees whole and thus restor[e] the economic status quo that would have obtained but for the company's wrongful [acts]." *NLRB v. Rutter-Rex, supra*, 396 U.S. at 263, 90 S.Ct. at 420. *See also Franks v. Bowman Transportation Co.*, 424 U.S. 747, 769, 96 S.Ct. 1251, 1266, 47 L.Ed.2d 444 (1976); *NLRB v. Hyde*, 339 F.2d 568, 572 (9th Cir. 1964). While the Board's mandate is to "take measures designed to recreate the conditions and relationships that would have been had there been no unfair labor practice," *Carpenters v. NLRB*, 365 U.S. 651, 657, 81 S.Ct. 875, 878–879, 6 L.Ed.2d 1 (1961) (Harlan, J., concurring), the Board's remedial orders must be appropriate and adapted to the situation which calls for redress, *NLRB v. United Mine Workers*, 355 U.S. 453, 458, 78 S.Ct. 386, 389–390, 2 L.Ed.2d 401 (1958), and they are unenforceable to the extent that they become punitive rather than remedial, *see Car-*

*penters v. NLRB*, 365 U.S. 651, 654-55, 81 S.Ct. at 877 878 (1961); *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 11 12, 61 S.Ct. 77, 79, 85 L.Ed. 6 (1940); *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 236, 59 S.Ct. 206, 220, 83 L.Ed. 126 (1938); *NLRB v. Florida Medical Center, Inc.*, 576 F.2d 666, 673 (5th Cir. 1978). Thus, the courts have refused to enforce remedies which seek to ameliorate conditions which would have existed in any event and are, therefore, not dependent upon the existence of an unfair labor practice. *See, e. g., NLRB v. Solboro Knitting Mills, Inc.*, 572 F.2d 936, 945–46 (2nd Cir.), *cert. denied*, 439 U.S. 864, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978); *Trico Products Corp. v. NLRB*, 489 F.2d 347, 353 (2nd Cir. 1973); *NLRB v. Charley Toppino & Sons, Inc.*, 358 F.2d 94, 96 (5th Cir. 1966); *Nabors v. NLRB*, 323 F.2d 686, 690 (5th Cir. 1963), *cert. denied*, 376 U.S. 911, 84 S.Ct. 666, 11 L.Ed.2d 609 (1964).

**11.** We need not decide whether the holding which is suggested by the panel's reading of the Board's opinion is a *permissible* interpretation of the Act. Since, as discussed *infra*, we conclude that the Board has *not* abandoned *Dee Cee Floor Covering*, we expressly decline to decide whether such a course of action would in fact be within its authority.

trolling law." *Seafarers v. NLRB*, 101 L.R.R.M. 2628, 2631 (D.C.Cir.1979). As the Supreme Court made clear in *NLRB v. Metropolitan Life Insurance Co.*, 380 U.S. 438, 443–44, 85 S.Ct. 1061, 1064, 13 L.Ed.2d 951 (1965), it is highly improper for "reviewing courts to substitute counsel's rationale or their discretion for that of the Board." It is the duty of the Board—not of the courts—to clearly set forth the intent of its decisions and to explain the basis of departures from its own precedent. Although the Board is entrusted with considerable discretion in its interpretation and application of the Act,[12] "[w]hen it so exercises the discretion given to it by Congress, it must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.'" *Id.* at 443, 85 S.Ct. at 1064. *See Central Power & Light Co. v. United States*, 634 F.2d 137, 149 (5th Cir. 1980); *Mitchell Energy Corp. v. FERC*, 580 F.2d 763 (5th Cir. 1978); *NLRB v. Sunnyland Packing Co.*, 557 F.2d 1157, 1160 (5th Cir. 1977). There is no such indication in the Board's opinion in this case. Furthermore, several cases subsequent to the Board's decision in this case, discussed *infra*, have made it clear that the Board did not intend to overrule *Dee Cee Floor Covering*.

Accordingly, we must interpret the Board's decision in this case in the context of the holding in *Dee Cee Floor Covering* that a union must reestablish its majority status at each new jobsite before it can enforce a section 8(f) prehire contract with a project-by-project employer. Reading the Board's opinion in this light, the Board appears to have found that while the Company was not bound by the Union-AGC contract at subsequent jobsites, relief extending beyond the termination of an enforceable contract was nevertheless required in order to fully restore the employees to the *status quo ante.* This apparent holding requires a factual finding (which the Board does not make, but instead leaves to the compliance stage of these proceedings) that particular employees would have been rehired by the Company despite its lawful option not to rehire them at the conclusion of ongoing projects. We hold that such a finding is precluded as a matter of law by factual findings already made by the administrative law judge and accepted by the Board. Therefore we must refuse the Board's application for enforcement of its order insofar as that order extends relief to projects not yet begun at the time of the unfair labor practices. In order to understand our interpretation of the Board's opinion and our conclusion as to its validity, it is necessary first to review the history of section 8(f) and its interpretation by the Board and by the courts; we will then describe the Board's apparent holding and apply that holding to the facts of this case.

**B.** *The History of Section 8(f) and its Interpretation by the Board and by the Courts*

The Board declined to exercise jurisdiction over the construction industry before 1947. As a result, "[c]oncepts evoked by the Board ... developed without reference to the construction industry." H.R.Rep.No. 741, 86th Cong., 1st Sess. 19 (1959), Reprinted at [1959] U.S.Code Cong. & Admin.News 2318; 1 NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, p. 777 [hereinafter cited as Leg.Hist.], *quoted in Higdon Construction Co.*, 434 U.S. at 348, 98 S.Ct. at 659. In 1959, Congress added section 8(f)[13] to the Act in response to the special characteristics and needs of the building and construction

---

**12.** Congress has entrusted to the Board the task of " 'applying the general provisions of the Act to the complexities of industrial life,'" *NLRB v. Weingarten, Inc.*, 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975) (citations omitted), quoting *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). "Its special competence in this field is the justification for the deference accorded its determination[s]." *NLRB v. Weingarten*, 420 U.S. at 266, 95 S.Ct. at 968.

**13.** Labor-Management Reporting and Disclosure Act of 1959, Pub.L.No.86–257, § 705(a), 73 Stat. 545. For text of section 8(f), see note 1, *supra.*

industry.[14]  The short duration and occasional nature of employment in that industry make ordinary collective bargaining negotiations—which must await the employees' choice of a bargaining representative—difficult at best.  Under section 8(f), the execution of an agreement with a minority union by an employer in the construction industry does not constitute an unfair labor practice.  This exception to the requirement of majority support at the time of the execution of the contract is limited, however, by a proviso to the section which states that a contract which would be invalid but for section 8(f) "shall not be a bar to a petition filed pursuant to section 9(c) or 9(e)."  Under this proviso, the employer, employees or union may request a bargaining representative election at any time.

In *NLRB v. Local 103, International Association of Bridge Workers (Higdon Construction Co.)*, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978), the Supreme Court discussed the legislative history of section 8(f) and the effect to be given section 8(f) agreements in the building and construction industry.  Higdon Construction Co. and Local 103 of the International Association of Bridge, Structural & Ornamental Ironworkers, AFL–CIO (Local 103), after several years of collective bargaining, entered into a prehire agreement requiring Higdon to abide by the terms of an "understanding" between Local 103 and a multi-employer association.  There was no union security clause in the Local 103-Higdon agreement.  When Higdon later undertook construction projects (through an alter ego company) with nonunion labor, Local 103 picketed those projects (one for more than 30 days) with signs stating that the employer was violating the agreement with the union.  The union did not represent a majority of the employees at the job sites and had not petitioned for a representation election.  The employer filed a charge with the NLRB alleging that the union was violating section 8(b)(7)(C) of the Act, which makes it an unfair labor practice for an uncertified union to picket for more than 30 days for the purpose of forcing an employer to recognize the union as the bargaining representative of his employees unless a petition for an election has been filed within that period.  Local 103 argued that its picketing did not constitute an unfair labor practice because, since Higdon had entered into a lawful section 8(f) prehire contract with Local 103 promising to abide by the multi-

---

**14.**  The House and Senate Committee Reports on section 8(f) reveal Congress' awareness of the transitory nature of employment in the construction industry:

> The occasional nature of the employment relationship makes this industry markedly different from manufacturing and other types of enterprise.  An individual employee typically works for many employers and for none of them continuously.  Jobs are frequently of short duration, depending upon various stages of construction.
>
> .    .    .    .    .
>
> In the building and construction industry it is customary for employers to enter into collective-bargaining agreements for periods of time running into the future, perhaps 1 year or in many instances as much as 3 years.  Since the vast majority of building projects are of relatively short duration, such labor agreements sometimes apply to jobs which have not been started.

H.R.Rep.No.741, 86th Cong., 1st Sess. 19 (1959), Reprinted at [1959] U.S.Code Cong. & Admin.News 2318; 1 Leg.Hist. 777.  *See also* S.Rep.No.187, 86th Cong., 1st Sess. 28 (1959); 1 Leg.Hist. 424.

The Senate Report also noted that "[r]epresentation elections in a large segment of the industry are not feasible to demonstrate ... majority status due to the short periods of actual employment by specific employers."  S.Rep.No.187, 86th Cong., 1st Sess. 55 (1959), Reprinted at [1959] U.S.Code Cong. & Admin. News 2318; 1 Leg.Hist. 451–52.

The Supreme Court, drawing from the legislative history of section 8(f), has noted:

> There were two aspects peculiar to the building trades that Congress apparently thought justified the use of prehire agreements with unions that did not then represent a majority of the employees:
>
> "One reason for this practice is that it is necessary for the employer to know his labor costs before making the estimate upon which his bid will be based.  A second reason is that the employer must be able to have available a supply of skilled craftsmen ready for quick referral."

*Higdon Construction Co.*, 434 U.S. 335, 348, 98 S.Ct. 651, 659, 54 L.Ed.2d 586 (1978) (citations omitted), *quoting* H.R.Rep.No.741, 86th Cong., 1st Sess. 19 (1959); 1 Leg.Hist. 777.

employer standard, the purpose of the picketing was to obtain compliance with an existing contract rather than to obtain recognition or bargaining as an initial matter.

The Supreme Court approved the long-standing position of the Board, *see R.J. Smith Construction Co.*, 208 N.L.R.B. 615 (1974), and held that the picketing by Local 103 was for recognitional purposes and constituted an unfair labor practice under section 8(b)(7)(C). The Court explained that the picketing was recognitional because

> a prehire agreement does not entitle a minority union to be treated as the majority representative of the employees until and unless it attains majority support in the relevant unit. Until that time the prehire agreement is voidable and does not have the same stature as a collective-bargaining contract entered into with a union actually representing a majority of the employees and recognized as such by the employer. Accordingly, . . . picketing by a minority union to enforce a prehire agreement that the employer refuses to honor, effectively has the object of attaining recognition as the bargaining representative with majority support among the employees, and is consequently violative of section 8(b)(7)(C).

434 U.S. at 341, 98 S.Ct. at 655–656.

In accepting the Board's position in *Higdon Construction Co.*, the Supreme Court emphasized the unique nature of prehire contracts under section 8(f). A prehire contract is a "preliminary step" which allows an employer in the construction industry to negotiate and to reach a tentative agreement with a union before that union becomes the majority representative of its employees. *Id.* at 345. The Court also emphasized the significant limitations which are implicit in any prehire contract. Section 8(f) was not intended to undermine the employees' right to bargain collectively through a representative of their own choosing. Hence the proviso to section 8(f), which states that a prehire contract "shall not be a bar to a petition filed pursuant to section 9(c) or 9(e)" of the Act. That is, a bargaining representative election may be

called at any time—despite the existence of a prehire contract between the employer and a union. Accordingly, the exception embodied in section 8(f) and allowing negotiations between an employer and a union which has not achieved majority status "is nevertheless of limited scope, for the usual rule protecting the union from inquiry into its majority status during the terms of a collective-bargaining contract does not apply to prehire agreements." *Id.* at 345, 98 S.Ct. at 657–658. Of course, the Supreme Court recognized that once the union does establish its majority status, its prehire contract with the employer "attains the status of a collective-bargaining agreement executed by the employer with a union representing a majority of the employees in the unit." *Id.* at 350, 98 S.Ct. at 660. Prior to that time, however, section 8(f) agreements are entirely voidable; since the union does not represent a majority of the employees, it is not entitled to enter into a binding collective-bargaining agreement with the employer.

Before the Supreme Court decided *Higdon Construction Co.*, the Board had already reiterated its analysis of section 8(f) in *Dee Cee Floor Covering, Inc.*, 232 N.L.R.B. 421 (1977). After reaffirming its conclusion that section 8(f) prehire contracts do not become enforceable until the union demonstrates majority support, the Board unequivocally adopted the related principle which concerns us today, that is, that a union must *reestablish* its majority status at *each* affected job site before it can enforce a section 8(f) agreement with a project-by-project employer. Dee Cee Floor Covering, a seller and installer of carpeting in the construction industry, did not maintain a regular complement of employees, but hired workmen as the need arose. In April 1973, Dee Cee entered into a collective bargaining agreement with the union. In April 1975, Dee Cee went out of business and Dagin-Akrab Floor Covering, Inc. (Dagin-Akrab), an alter ego of Dee Cee, came into being and entered into a contract identical to the 1973 Dee Cee-union contract. In August 1975, Dagin-Akrab was awarded a contract to buy and install

carpeting at the Ft. Riley military installation. In recruiting workmen for the project, Dagin-Akrab informed several union members that work at the project would be on a nonunion basis only and, if they wished such employment, they would have to withdraw from the union. Dagin-Akrab told them that they would pay union scale wages but would not pay any union fringe benefits as required by the April 1975 agreement. Some workers accepted employment with Dagin-Akrab and others, refusing to abandon the union, did not. The administrative law judge found that Dagin-Akrab, by making unilateral changes in the terms and conditions of employment and by refusing to bargain with the union, violated section 8(a)(5) and (1), and found, in addition, that Dagin-Akrab violated section 8(a)(3) by conditioning employment at the Ft. Riley project upon employees withdrawing from the union.

The Board affirmed the administrative law judge on the section 8(a)(3) finding, but refused to accept his recommendation on the section 8(a)(5) and (1) violations. The Board reasoned:

> [Section 8(f)] merely immunizes the parties to such agreements from liability under Section 8(a) and (b) of the Act. Such prehire agreements do not, however, give rise to a presumption of majority status on behalf of the union. Thus, where a union fails to prove that it has obtained majority status among the employer's employees, an employer may withdraw recognition from that union and/or make unilateral changes in the contractual working conditions without thereby violating Section 8(a)(5) of the Act.

While the April 1975 agreement was validly entered into pursuant to Section 8(f) of the Act, that agreement was not binding on the Respondent for purposes of Section 8(a)(5) until such time as the Union demonstrated that it enjoyed the support of a majority of the Respondent's employees employed at the Ft. Riley project. However, in light of the fact that Respondent had no employees working for it either at the time that it executed the contract or when it unilaterally set the conditions of employment at the Ft. Riley project and refused to bargain with the Union, it is obvious that the Union could not have had a majority status.

Furthermore, the mere fact that the Union might indeed have represented a majority of the employees at Respondent Dee Cee's previous job sites is of no consequence inasmuch as the Union must demonstrate its majority at each new job site in order to invoke the provisions of Section 8(a)(5) of the Act. As the facts here show that the Respondent had no employees at the Ft. Riley job when it decided to abrogate its prehire agreement with the Union, no violation of Section 8(a)(5) of the Act can be found. Moreover, although Dagin-Akrab as the *alter ego* of Dee Cee would normally have been bound to Dee Cee's 1973 agreement, no violation can be found in its failure to apply that agreement at the Ft. Riley job, since it had no employees working at that job when the unilateral changes were made. Therefore, a refusal-to-bargain violation also cannot be predicated on the breach of the 1973 agreement.

232 N.L.R.B. at 422 (footnotes omitted).[15]

In recent cases the Board has distinguished *Dee Cee Floor Covering,* which

---

**15.** Although the Board did not explicitly adopt this analysis until *Dee Cee Floor Covering,* it seems to have implicitly followed it in previous cases. In *Ruttman Constr. Co.,* 191 N.L.R.B. 701 (1971), the Board refused to apply a presumption of majority status to a new project where the employer had executed a prehire agreement containing a union security clause with one union but signed and put into effect a new prehire agreement with another union while the first prehire agreement was still in effect. The Board stated that a prehire agreement "is merely a preliminary step that contemplates further action for the development of a full bargaining relationship: such actions may include the execution of a supplemental agreement for certain projects or covering a certain area and the hiring of employees who are usually referred by the union or unions with whom there is a prehire agreement." *Id.* at 702. *See also Roberts & Schaefer Co.,* 193 N.L.R.B. 860 (1971) (citing *Ruttman* in holding

involved a "project-by-project" employer, from cases involving an employer with a "stable work force." *See Hageman Underground Construction*, 253 N.L.R.B. No. 7 (1980); *Corrugated Structures, Inc.*, 252 N.L.R.B. No. 79 (1980); *Land Equipment, Inc.*, 248 N.L.R.B. No. 98 (1980); *Precision Striping, Inc.*, 245 N.L.R.B. No. 34 (1979). The Board has held that where an employer employs a stable work force (rather than employing new workers on a project-by-project basis) the union need not reestablish its majority status at each successive jobsite in order to enforce a section 8(f) agreement with the employer. As the Board explained in *Hageman Underground Construction*:

> [W]here an employer employs a permanent and stable work force to work on a multisite basis, and the union, initially recognized under section 8(f), subsequently achieves majority status in that stable work force, the employer is then under a statutory duty to recognize and bargain with that union at all projects without requiring the union to demonstrate majority status at each one. It logically follows, and we so held in *Precision Striping*, that where there is a majority status

in a permanent and stable work force, and a contract in effect between the parties covering that work force, the union not only becomes the employees' statutory bargaining representative for all present and future sites but, as in a typical industrial setting, also enjoys an irrebuttable presumption of majority status for the duration of the agreement.

253 N.L.R.B. at —— (footnotes omitted). We need not decide whether this interpretation of the Act is a permissible one, and need not examine precisely where the Board has drawn the line between "project-by-project" and "stable work force" employers, for the Board has explicitly affirmed the finding of the administrative law judge that Haberman Construction Co. was a *project-by-project* employer. The cases which draw this distinction themselves reaffirm the rule of *Dee Cee Floor Covering* in the context of a project-by-project employer. As the Board explained in a footnote to the above text from *Hageman Underground Construction*:

> This contrasts with a situation in which a construction industry employer has no stable complement and hires its employ-

that a section 8(f) nationwide bargaining agreement between the company and a union "never matured into a full bargaining relationship between [the company and that union] as to a new project begun by the Company during the contract term). In *Irvin-McKelvy Co.*, 194 N.L.R.B. 52 (1971), *enforced in part sub nom. NLRB v. Irvin*, 475 F.2d 1265 (3rd Cir. 1973), the Board held that by virtue of compliance with union security provisions in a section 8(f) contract the union had majority status at those projects still underway, but dismissed the complaint with respect to projects not yet begun at the time the employer terminated the union contract and entered into a contract with a rival union.

In *Iron Workers Local 103*, 216 N.L.R.B. 45 (1975), the Board cited *Ruttman* for the proposition that section 8(f) contracts "do not carry, even with union-security provisions, a presumption of majority status until such time as employees for particular projects have been hired." *Id.* at 46 (footnote omitted). In addition, the Board cited its dismissal in *Irvin* of the complaint concerning unfair labor practices with respect to projects not yet begun at the time the employer terminated the section 8(f) contract at a time when the union enjoyed majority support.

Although the precedential value of *Ruttman* and *Irvin* might properly have been discounted before *Dee Cee Floor Covering* because of their somewhat unusual factual contexts, *see* King & LaVaute, *Current Trends in Construction Industry Labor Relations—The Double-Breasted Contractor and the Prehire Contract*, 29 Syracuse L.Rev. 901, 932–37 (1978) (emphasizing that the *Irvin* prehire contract was converted into a "project only" contract by virtue of a "most favored nations" clause in the contract and the execution of a "project only" contract by the union with another contractor, and that the *Ruttman* contract may not have been strictly applicable to the new project undertaken by the Company), our reading of *Dee Cee Floor Covering* dispels any doubts about the Board's position which the limited factual contexts of *Ruttman* and *Irvin* might have engendered. In *Dee Cee Floor Covering*, the Board unequivocally stated, in the context of a section 8(f) contract which was not limited to current projects only and where a majority of the employees on the company's projects had supported the union, that the union must reestablish its majority status on each new project.

ees on a project-by-project basis with little carryover from site to site. In such situations majority status among employees at a given jobsite is not presumed to carry over automatically to future sites and "the union must demonstrate its majority status at each new jobsite in order to invoke the provisions of Section 8(a)(5) of the Act." *See Dee Cee Floor Covering, Inc. and its Alter Ego and/or Successor, Dagin-Akrab Floor Covering, Inc.,* 232 N.L.R.B. 421 (1977). 253 N.L.R.B. at —— n.7. In fact, the Board specifically referred in *Hageman* to its opinion in *Haberman,* distinguishing *Haberman* as a case involving a project-by-project employer. *Id.* at n.9. We can only conclude, therefore, that the Board continues to adhere to the rule enunciated in *Dee Cee Floor Covering*: in order to enforce a section 8(f) contract with a project-by-project employer, the union must reestablish its majority at each successive jobsite.

C. *The Affirmative Remedy Ordered by the Board and Its Validity in This Case*

■ The Board appears to have applied the rule of *Dee Cee Floor Covering* and concluded that the Company was not bound by the Union-AGC contract at subsequent jobsites. Although the Board did not cite *Dee Cee Floor Covering,* it explicitly recognized that the Company, "which hired employees on a project-by-project basis, might have discharged the discriminatees in the normal course of business when the projects were completed." 236 N.L.R.B. at 79. It does not appear, therefore, that the distinction between "project-by-project" and "stable work force" employers was an issue considered by the Board in this case. This contrasts with the recent cases of the Board discussed *supra,* in which the determinative issue was whether a valid contract existed at the particular project on which an alleged unfair labor practice had occurred. Here the Board accepted at the outset that the Company was a project-by-project employer and that the Union would therefore have to reestablish its majority status at each succeeding jobsite. The Board does not assert that the Company would be bound by the contract at subsequent jobsites; to the contrary, the opinion states that the Company could have "discharged the discriminatees in the normal course of business" at the conclusion of ongoing jobs. The determinative issue seems instead to have been the applicability of a remedial order which admittedly extended beyond the term of an existing contract but was nevertheless required in order to restore the economic *status quo ante* to particular employees who would have been rehired on subsequent projects, despite the termination of the Company's obligations under the Union-AGC contract, were it not for the unfair labor practices committed while the contract was in force. The Board explained that, while the Company could have replaced its employees at the conclusion of ongoing projects, there was nevertheless "a distinct possibility that, absent its discrimination, Respondent would have retained, transferred, or rehired *at least some of the discriminatees* for new projects." *Id.* (emphasis added). On this basis the Board ordered the Company to reinstate on its current projects *those particular employees* who would have been retained but for their wrongful discharge, and to make those employees whole accordingly. *Id.* at 80. Thus, the Board's opinion and order appear to restore the discriminatees to an economic position to which they were not contractually entitled (since the Company could have terminated its obligations under the Union-AGC contract at the conclusion of ongoing projects), but which the Board felt they might nevertheless have attained (since the Company might have rehired some employees even if not contractually bound to do so). Underlying this holding is the proposition that an affirmative remedial order extending beyond the termination of ongoing projects is necessary to restore the economic *status quo ante* to those particular employees who would have been rehired absent the Company's unlawful discrimination against them. This proposition is implicit in the Board's brief explanation of its decision; after the opinion suggests the possibility that some of the discriminatees might have been rehired absent the Company's unfair labor practices, it explains:

*Accordingly, to remedy fully Respondent's unfair labor practices and protect the discriminatee's rights,* we shall order Respondent to reinstate the discriminatees . . . and to make them whole . . . . *Id.* at 79 (emphasis added). As we read the Board's opinion, then, it seeks to restore the discriminatees to an economic position they might in fact have attained despite the Company's lawful right not to rehire them at the termination of projects in progress.

We recognize that the remedial authority of the Board may at least in some cases be used to restore the parties to economic positions they reasonably expected to occupy in the absence of unfair labor practices, whether or not those expectations rest on legally enforceable obligations. As we explained in *Nabors v. NLRB,* 323 F.2d 686 (5th Cir. 1963), *cert. denied,* 376 U.S. 911, 84 S.Ct. 666, 11 L.Ed.2d 609 (1964) (including profit shares, which had been voluntarily but consistently awarded by the employer in the past, in the computation of back pay awards):

> In effectuating the policies of the Act, the Board has taken the position that the "make whole" concept does not turn on whether the pay was wholly obligatory or gratuitous, but on the restoration of the *status quo ante.* See *Moss Planing Mill Co.,* 110 NLRB 933, 935, enforced as modified on other grounds, *NLRB v. Moss Planing Mill Co.,* 4 Cir., 1958, 256 F.2d 653, 654. In that case there was included in back pay an amount representing clothing given gratuitously as Christmas gifts. The Board's discretion to take such affirmative *remedial* action as will effectuate the purposes of the Act includes more than placing the employee in position to assert contractual or legally enforceable obligations. "Back pay" as used in section 10(c) includes the moneys, whether gratuitous or not, which it is reasonably found that the employee would actually have received in the absence of the unlawful discrimination. That principle seems to us so clear as to make unnecessary a discussion of the many persuasive authorities cited in the briefs of both parties.

323 F.2d at 690. *See McCann Steel Co. v. NLRB,* 570 F.2d 652, 656 (6th Cir. 1978) (overtime pay ordinarily received may be included in back pay); *NLRB v. Madison Courier, Inc.,* 472 F.2d 1307, 1312 n.9 (D.C. Cir.1972) (Christmas bonuses included in back pay); *NLRB v. Miami Coca-Cola Bottling Co.,* 360 F.2d 569, 572 (5th Cir. 1966) (safe driving award included in back pay); *NLRB v. Exchange Parts Co.,* 339 F.2d 829, 832 (5th Cir. 1965) (Christmas bonus included in back pay).

We note that none of the cases we cite here for the proposition that the Board may order relief to which a party would not have been contractually entitled in the absence of an unfair labor violation involves a dispute arising in the special context of section 8(f) and the construction industry. We need not decide, however, whether this principle does or should extend to this area, for it clearly has no application to the particular facts of this case. The Board did not explicitly reach the factual questions raised by our interpretation of its action; instead, it left "[t]he determination of which employees, if any, would have continued in respondent's employment and for how long" to "the compliance stage of the proceedings." 236 N.L.R.B. at 79. But although the Board did not predetermine the results of such an inquiry, it at least suggested the possibility of a factual finding that the Company would have retained, transferred, or rehired some of the discriminatees on subsequent projects.

This suggestion ignores the factual findings already made by the administrative law judge and adopted by the Board. In the first place, the administrative law judge described as follows the Company's decision to go "open shop" and to cease paying union benefits:

> In November, 1976, Beshears' employment with the Respondent ceased. His duties, if not his title, were assumed by Carpenter Foreman Randolph Whitfield. About February 1977, Respondent hired a new Superintendent, Robert McElyea. According to Respondent's general mana-

ger, Howard Haberman, after McElyea was hired Haberman and Bert Speed talked to McElyea who expressed the opinion that he could "do the job that we had on an open shop basis, without us having to pay the union pension thing . . . ." *It was concluded that the Respondent should proceed on that basis because the pension "thing" was a costly item running a $1000 to $1200 a month toward the latter part of the year 1976.*

236 N.L.R.B. at 82 (emphasis added). In the second place, the administrative law judge found that the two Austin projects from which the employees were constructively discharged were "almost completed" at the time of the unfair labor practices. *Id.* at 87. These findings must be read in the context of the Company's right to terminate its obligations under the Union-AGC contract at the conclusion of ongoing projects. Since the purpose of the Company's actions was to cut its expenses, and since these actions could lawfully have been taken at the conclusion of ongoing projects (which were almost completed), one can only assume that in the absence of the unfair labor practices the Company would lawfully have decided to go "open shop" and to cease paying union benefits at the conclusion of the projects from which the discriminatees were constructively discharged.

A factual finding that any particular employee would be rehired depends, therefore, on the assumption that that employee would have returned to work on a subsequent project despite the Company's decision to go "open shop" and to cease paying union benefits. As the administrative law judge found, however, the employees quit the Company's employment precisely because of these actions:

The testimony of all of the foregoing named employees at the hearing with respect to the reasons for quitting was not contradicted by Respondent. I therefore credit their testimony which clearly establishes that *the basis for their quitting was Respondent's decision to go "open shop" and no longer pay their "fringes," i. e., payments to the Union's funds.*

*Id.* at 86 (emphasis added). Because the discriminatees (according to their own testimony) were unwilling to work under the conditions which it is clear the Company would have lawfully offered, we can only conclude that none of them in fact would have accepted employment by the Company on subsequent projects. We hold, therefore, that a factual finding that the Company would have "retained, transferred, or rehired at least some of the discriminatees for new projects" is foreclosed as a matter of law by factual findings already adopted by the Board. Absent such a finding, there is no basis in the facts of this case for the Board's order insofar as that order extends relief to projects not yet begun at the time of the Company's unfair labor practices.

■ Accordingly, the application for enforcement of the Board's contract restoration order (paragraphs 1(a), 2(b), and 2(c)) is DENIED insofar as it applies to construction projects commenced by the Company after February 16, 1977. The application for enforcement of the Board's reinstatement order (paragraph 2(d)) is DENIED. The application for enforcement of the "make whole" portion of the Board's reinstatement order (paragraph 2(e)) is DENIED insofar as it applies to construction projects commenced after February 16, 1977. The application for enforcement of the Board's bargaining order (paragraphs 1(b) and 2(a)) is DENIED.[16] In all other respects, the Board's order is ENFORCED.

16. In denying enforcement of the Board's bargaining order, we do not rely on the Company's argument that *the order is unenforceable because it mandates bargaining without regard to the majority status of the Union. The propriety of a bargaining order does not normally depend upon the existence of majority status throughout the period between the time of the unfair labor practices and the time for enforcement of the Board's order. On the contrary, the relevant date for determining the extent of the Company's duty to bargain and, thus, the propriety of a bargaining order is the time of the unfair labor practices. Franks Bros. Co. v. NLRB, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944). The Board therefore properly ordered bargaining. Nevertheless, in view of the lapse of time between the unfair labor practices and

JERRE S. WILLIAMS, Circuit Judge, with whom, RUBIN, KRAVITCH, HATCHETT, TATE, SAM D. JOHNSON and THOMAS A. CLARK, Circuit Judges, join, concurring in part and dissenting in part:

The Court in a thorough and scholarly presentation upholds the order of the National Labor Relations Board in full in finding appellant Haberman Construction Company violated §§ 8(a)(1), (3) and (5) of the National Labor Relations Act. I concur fully in that decision as set out in parts I and II of the opinion. My dispute is wholly with part III in which the Court permits only a truncated and ineffectual remedy to the Board to cure the impact of the unfair labor practices committed by Haberman.

The statement of facts in the majority opinion is complete and objective. The key facts in evaluating the remedy are: 1. The company disavowed the collective agreement under which it was operating during its existence but not long before it was to expire. 2. The construction projects upon which the employed carpenters were working were also soon to end. 3. This employer did not have a steady workforce but hired on a project-by-project basis. The Court uses the soon-to-expire contract, the soon-to-end projects, and the project-by-project hiring to enable the employer to escape the full impact of the Board's remedies for his unfair labor practices. It is at this point that I must part company and register this dissent.

No assertion is made that the Board had no legal power to act beyond the termination of the then current contract and the then current jobs. The Court correctly concedes that the Board does have such power. But applying such power in this case, the Court concludes, is punitive. This opinion will undertake to demonstrate that this exercise of power by the Board is not punitive but strives only to reconstruct the status quo as if the employer had not engaged in the unfair labor practices. This is the proper power for the Board to exercise in formulating its remedies. *N. L. R. B. v. J. H. Rutter-Rex Mfg. Co.*, 396 U.S. 258, 263–65, 90 S.Ct. 417, 420–421, 24 L.Ed.2d 405 (1969).

The clearest way to see the impact of the refusal to allow the Board to extend its remedies beyond the contract expiration and the project terminations is to evaluate the situation of the employer if he had not breached the contract, refused to bargain, and discharged the employees, but had waited until the contract expired and the jobs were over. The Court relied upon the fact that the employer then could have discharged the employees, declared an "open shop", hired employees for new projects and paid them without regard to union working conditions.

While factually true as far as it goes, this conclusion needs amplification. In the first place, the "discharge" of the employees from the concluded projects would have been no more than ending the work and paying off employees after the work is over. It had no relationship whatsoever to possible rehiring on later projects in a project-by-project situation. In the second place, the announcement that the company was going "open shop" itself would be an unfair labor practice if the company meant to guarantee there would be no union recognition and no collective bargaining. Assuming that the company knew it could not follow the classic definition of "open shop" and hire so as to insure there would not be a union majority,[1] the employer by declar-

---

our consideration of the order, the special nature of employment in the construction industry, and our holding that the employer's unfair labor practices were not the reason for loss of majority status after the termination of the current projects, we do not think a need for enforcement of the order exists at this time. *See NLRB v. Irvin*, 475 F.2d 1265, 1271 (3rd Cir. 1973) (denying enforcement of a bargaining order in light of length of time between end of projects to which order applied and court's

decision); *cf. NLRB v. American Cable Systems, Inc.*, 427 F.2d 446, 448–49 (5th Cir.), *cert. denied*, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970) (recognizing the necessity under certain circumstances for consideration of changed circumstances in context of *Gissel*-type bargaining order).

1. The original meaning of "open shop" was a business where the employer announced he would not deal with a union regardless of union majority and usually carried with it the further

ing an open shop would be doing no more than declaring that there is now no binding contract and that it is going to offer its self-determined wages and working conditions. Under the law an employer has no power to select employees on the basis of union membership or attitudes toward unions or collective bargaining. He must consider all applicants regardless of their union affiliations, attitudes, or activities. 29 U.S.C. § 158(a)(3) (1976); *Local 357, Internat'l Bro. of Team., Etc. v. N. L. R. B.*, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961).

This in turn means that there is no obligation to bargain on a new project only so long as the union lacks a majority. The employees hired will have the right to try to organize the project and gain a majority. If they do, the employer will be required to bargain with them collectively. They may use the usual self help devices in trying to organize the new project such as recognitional picketing, striking, the collecting of authorization cards, and petitioning for an election. *See, e. g., N.L.R.B. v. Phil-Modes, Inc.*, 396 F.2d 131 (5th Cir. 1968); *Smitley v. N.L.R.B.*, 327 F.2d 351 (9th Cir. 1964).

So it is that an employer in the construction industry in no way avoids his elemental obligations under the statute by hiring on a project-by-project basis. The fundamental protection of the rights of employees to organize and bargain collectively and not to be discriminated against because of their union activity or interest remains intact.[2]

By refusing to extend the Board's remedies beyond the expiration of the prior contract and the expiration of the prior projects, the Court leaves this employer in precisely the same situation he would have been in after such expiration if he had not committed the serious unfair labor practices

revealed by this record. And the Court insists that going beyond allowing him this easy escape from his serious practices is punitive and therefore barred to the Board.

The Board's remedies are punitive only if the employer's unfair practices made no change in the situation of the union and the employees which carries its impact beyond the expiration of the contract and the prior projects. Yet, the impact of the employer's unfair practices does extend beyond that time and does have a serious continuing effect. The employer has prejudiced the entire situation with respect to his future business activities and the hiring of employees by the actions which he took. We should not close our eyes to whatever impact the employer's unfair labor practices had after the contract expired and the projects ended.

The heavy lingering effect of the employer's unfair labor practices is manifest. This employer has by his actions told his present and future employees that he cannot be trusted to bargain with the union even though he is lawfully bound to do so and that he may well discriminate against union employees in his future conduct. The Court labors under a misapprehension. The employees involved did not quit because they did not like to work under nonunion working conditions. They were discharged, as the Court concedes, because the employer's unfair labor practices (1) created intolerable conditions of employment and (2) constituted conduct to discourage union membership. This employer has committed these offenses. For an employee who was a union member or inclined toward union membership to go to work for this employer after the commission of these offenses would require acceptance that the employer has

implication that any employee who joined a union would be discharged. Taft, Organized Labor and American History, p. 360–1 (1964). The National Labor Relations Act, of course, outlawed such open shops. 29 U.S.C. § 8(a)(1), (3), (5). Yet note the close parallel of this employer's unfair labor practices to the classic "open shop" concept.

**2.** The purpose of the 1959 amendment contained in § 8(f), 29 U.S.C. § 158(f), providing for

pre-hire agreements, was to add to the rights of employees to organize and bargain collectively in the building construction industry, not to take any rights away from them. Gorman, Basic Text on Labor Law 667–8 (1976). While the collective bargaining agreement involved in this case began as a pre-hire agreement under § 8(f), at the current stage of this case pre-hire agreements are irrelevant. *See* fn. 4, *infra.*

tainted the work relationship and can reasonably be expected to engage in conduct which discriminates against union membership and creates intolerable working conditions for those who are union members. Why? Because he has already done so even in a situation where under contract he was bound to do otherwise.

The Court attempts to avoid the significance of the impact of the constructive discharge on the employees by asserting that they were not guaranteed steady employment by the employer and that in any event they would not work for wages and working conditions short of the union requirements.

Neither assumption is warranted. The Court undertakes to establish the proposition that none of the past employees of Haberman could be expected to be hired on new projects. Recent NLRB cases such as *Hageman Underground Construction*, 253 N.L.R.B. No. 7 (1980),[3] make a distinction between construction contractors who have a "stable" workforce and those who hire on a project-by-project basis. It is accurate that the Board properly referred to the *Haberman* case in *Hageman* as a case involving project-by-project hiring.

Next, the Court goes to *Dee Cee Floor Covering, Inc.*, 232 N.L.R.B. 421 (1977), and notes that there was no likelihood of the union's obtaining a majority on the specific project involved in that case. Then it concludes that this is true in the instant case also. Succinctly, the position is that there are only two alternatives in the construction industry. Either there is a steady workforce of regular employees or there is no possibility of continuity of employment at all.

There is no justification in the law for such an either/or requirement. *Dee Cee Floor Covering* involved an employer who committed an unfair labor practice by announcing that he would not hire union employees for a large new project when there were no projects currently going on, there was no contract in effect, and there was no

proof of carryover of employees. In contrast, in this case the Board found specifically and accurately, without dispute, that a number of employees of Haberman at the time of the unfair labor practices "enjoyed continued employment with Respondent over several projects." *Haberman Construction Co.*, 236 N.L.R.B. 79, n.3 (1978). This finding, coupled with the fact that the employer by law had no right to discriminate against union employees in hiring for new projects, justifies the Board's conclusion that "there is a distinct possibility that, *absent its discrimination*, Respondent would have retained, transferred, or rehired at least some of the discriminatees for new projects." *Id.* at 79. (Emphasis added).

The Court usurps the function of the Board when it concludes that prior employees of Haberman would not have worked for Haberman on new projects absent the unfair labor practices. This conclusion is supported by saying that the employees quit because Haberman would no longer pay the union pension benefits. But as is pointed out above, the employees did not quit; they were discharged. We do not know what their attitude would have been to offers of employment if there had been no discrimination and the employees could be confident that the employer would obey the law.

The employees had at least the right to consider if they would accept employment free of employer anti-union coercion and to apply if they would. That right was destroyed by the employer's unfair labor practices. Without the Board's order, the likelihood that Haberman would offer employment to the employees it discharged is nil. Further, the employees frequently hired by the employer in the past had the right to hope that they could organize the next projects and then require bargaining, since the employer could not discriminate against the union in hiring and tenure policies. They had the right to be considered for work in the hope that they could get the pension benefits later through bargaining by establishing a majority at the projects.

---

**3.** *See also Corrugated Structures, Inc.*, 252 N.L.R.B. No. 79 (1980); *Land Equipment, Inc.*, 248 N.L.R.B. No. 98 (1980); *Precision Striping, Inc.*, 245 N.L.R.B. No. 34 (1979).

And they had the right to engage in organizational activities including picketing and striking to accomplish these objectives. These lawful employee/job applicant opportunities were destroyed by the unfair labor practices of the employer.

Instead of the employees finding themselves free to consider whether they would be willing to work at less than full union working conditions either because they needed employment or because they hoped in the future to organize the business, the employer through his unfair labor practices notified the employees that he would discharge them for union activity, that he would breach collective bargaining agreements, that he would refuse to bargain, and that he would make working conditions intolerable for union employees. That basic employer attitude which the Board is trying to remedy by its order is not at all eliminated by the expiration of the earlier contract and the ending of the earlier projects. The employer is allowed to exculpate himself merely by the passage of a short period of time with the expiration of a collective agreement and the ending of work projects.

When this employer committed the unfair labor practices his actions were in the face of the even more stringent situation where he was bound not only by law but by contract not to do so. This was a strong anti-union message to employees and job seekers. There is nothing in the National Labor Relations Act nor in the jurisprudence of the Board and courts which justifies saying that an employer may so easily avoid the impact of such unfair labor practices. To allow him to bear no further responsibility

is to thwart the valid concerns of those who work for him or wish to do so.

As a result of the unfair labor practices in this case, the employees are faced with a wholly distorted situation in making a decision as to whether to apply for employment in new projects with this employer. The possibility of actually being hired, let alone the prospect of gaining a majority on the next projects, which normally was a good chance because past projects did have union majority, has been all but destroyed by the employer's action. It would be foolish for these employees, innocent of any wrongdoing, now to assume that they have nothing to fear from an employer who has acted as this employer acted just a few months before. It is not enough to limit the Board to saying he should not have done it, and then allow only a brief and transitory remedy.

The Board in fashioning its remedy said that the only way it can make these employees whole for the violations of the law which have been committed to their disadvantage is to require that they be given the opportunity to be hired on future projects and to be awarded back pay for their losses. All parties are agreed that the pre-hire contract, converted to a collective bargaining agreement, has expired and its terms are no longer in effect. The Board concedes that this is so.[4] Establishing the back pay liability for these employees requires the determination of whether they would have been given the opportunity to work[5] and what their pay would have been absent employer unfair labor practices. The Board may very well have difficulty establishing the fact that they would have been hired

---

4. The panel opinion required the pre-hire agreement's terms to be carried over into the new projects but the Board order did not do so. The Board order stated:

> The Administrative Law Judge includes a brief statement in the remedy section which arguably suggests that he is ordering Respondent to comply with Union-AGC agreements which succeed the 1974–77 agreement. However, it is clear from the terms of his Order, which we are adopting in relevant part, that Respondent need not honor any such agreement unless it agrees to do so after bargaining with the Union.

236 N.L.R.B. at 79, n.2. The Board in its en banc brief attempted to uphold the conclusion

of the panel decision but had not taken this position earlier in its original brief to the Court.

5. The Board did not automatically require that all prior employees who quit be reinstated. The Board saved for the compliance stage the determination of which employees would have otherwise been rehired. In the last sentence of its opinion, the Board stated:

> [T]he determination of which employees, if any, would have continued in Respondent's employment and for how long can best be made at the compliance stage of the proceedings, to which we defer the matter.

236 N.L.R.B. at 79.

and the amount of back pay because there is unavoidable conjecture about what they would have gotten if they had gone to work on future projects and whether projects would have been organized or not.[6]

But that is not for this Court to decide. All this Court is called upon to decide is whether the Board should undertake to make these employees whole from the effect of the unfair labor practices. The Court does not allow the Board even to try to make them whole. The excised order it sanctions ignores that they were discharged and that the conduct of the employer made clear they were unwelcome in the future. The issues of which employees are to be reinstated and the amount of back pay are not before us.

The Board also includes in its order the obligation on the employer to bargain collectively. This is a standard order in situations where a bargaining relationship was established and it is shown to be destroyed because of the unfair labor practices of the employer. We should not draw a speculative conclusion that the employees would not have obtained a majority in the future projects. The employer made it impossible for them to do so through his unfair labor practices. Orders to bargain collectively when the employer has destroyed the union majority through unfair labor practices are the usual Board remedy. *N.L.R.B. v. Warren Co., Inc.*, 350 U.S. 107, 112, 76 S.Ct. 185, 188, 100 L.Ed. 96 (1955); *N.L.R.B. v. Alterman Transport Lines, Inc.*, 587 F.2d 212, 228 (5th Cir. 1979); *N.L.R.B. v. Poultry Enterprises, Inc.*, 207 F.2d 522, 525 (5th Cir. 1953). *Dee Cee Floor Covering* is in no way contrary to such an order. In this case the employer destroyed the collective bargaining relationship while it was in existence. This was not the *Dee Cee Floor Covering* situation. The employer cannot now escape the collective bargaining relationship by saying it might have escaped such a relationship if it had not violated the statute. It might or it might not have. But its unfair labor practice precluded the continuation or reestablishment of the bargaining relationship by destroying continuation in employment.

It is true we do not presume a union majority on each new project in a project-by-project hiring situation. But the Court in this case presumes a lack of majority. The presumption is correct but only because the employer's unfair labor practices made it so. Yet the Court authorizes the employer to act exactly as if he had not prejudiced the situation of prospective employees by his violations of law. The only way to remedy the alteration of the status quo by the employer's unfair labor practices is to issue a bargaining order which compels bargaining until the effects of the employer's unfair labor practices no longer have a significant impact. This is elementary law under the National Labor Relations Act. Gorman, Basic Text on Labor Law 532–39 (1976).

There is, of course, no way actually to restore the situation which existed when the employer committed the unfair labor practices. There are too many variables as to the future actions and attitudes on the part of both employees and employer. It follows that someone must bear the losses brought about by the inability wholly to restore the status quo. The compelling iro-

**6.** The order of the Administrative Law Judge, adopted by the Board with modification, must be read and evaluated carefully. As the Board indicated in its statement quoted above in footnote 4, the order could be read as a requirement that the terms of the existing contract would be continued after it expired, and that all employees were entitled to reinstatement. But that order was directed at the situation of a contract assumed to be still in effect and of projects which were still going on. Reinstatement in those projects and backpay awards under that contract obviously were justified. Of course, at that time, the purpose of couching the order in those terms was to entitle them to back pay in accordance with the contract terms then in existence before the projects were over. The Board's decision makes clear that the Administrative Law Judge's order is to be read this way and not as requiring the terms of the expired contract to be carried over into new projects. Further, the Board makes clear that after the projects expired the order does not apply to employees who would not have been hired again even if there had been no unfair labor practices in the past and if the employer in hiring did not discriminate on the basis of union membership, activity, or sympathy among the prospective employees.

ny of the Court's view is that it does not place the losses upon the wrongdoer but instead upon those who were the victims.

The Court properly reminds us that the "remedial power of the Board is 'a broad and discretionary one, subject to limited judicial review.' *Fibreboard Corp. v. N.L.R.B.*, 379 U.S. 203, 216 [85 S.Ct. 398, 406, 13 L.Ed.2d 233] (1964)." It is well to add the early admonition of the Supreme Court that a remedial order may not be overturned "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Electric & Power Co. v. N.L.R.B.*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). With all due respect such a showing is not even close to being made in this case. Since it is clear the impact of employer's actions persists in this construction industry context, the remedies are not punitive but designed only to do the best that can be done to reconstruct the status quo.

These employees are entitled to this remedy and the public is entitled to the vindication of its statutory policy until the vestiges of employer's unfair labor practices have been dissipated. The order of the National Labor Relations Board in this case should be enforced in full.